DANIEL G. ELLISTON AND SONJA A. ELLISTON, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27000–81.     Filed May 23, 1984.

*Larry K. Hercules* and *Edward G. Lavery*, for the petitioners. *James R. Turton*, for the respondent.

OPINION

COHEN, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1975 | $2,823.78 |
| 1976 | 6,682.94 |
| 1977 | 24,304.34 |
| 1978 | 6,637.72 |

After concessions by petitioners, the issue remaining for decision in this fully stipulated case is whether section 465(c)(2)[1] permits the gains of certain limited partnerships (the second-tier partnerships) to be netted against the losses of other second-tier partnerships in determining petitioner Daniel G. Elliston's net distributive gain or loss from his interest in a general partnership (the first-tier partnership) that was the limited partner in each of the second-tier partnerships.

Petitioners were husband and wife and resided in Dallas, Tex., when they filed their petition herein. All future references to "petitioner" will be to Daniel G. Elliston.

During all relevant times, petitioner owned a 30.69-percent interest in the capital and profits and losses of a general partnership formed under Texas law on April 29, 1976, and known as Dallas Associates (or the partnership).[2] Joe B. Dorman, I. E. Barlow, and Richard R. Wadsworth, Jr., were petitioner's partners in Dallas Associates. The business purpose of the partnership was to hold and maintain interests in various limited partnerships and to provide a single entity through which all interests in the transactions of the limited partnerships could be collected, summarized, and distributed.

Petitioner and his partners also incorporated Intercap Corp. (Intercap) and were its sole shareholders. In 1976 and 1977, Intercap and Dallas Associates formed five limited partnerships, identified as:

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[2]The parties have so stipulated. The written partnership agreement indicates that petitioner's interest in Dallas Associates was actually held for him in trust until Dec. 31, 1976. This does not affect the outcome of the case, however, so we will accept the parties' stipulation.

| *Limited* *partnership* | *Date of commencement* *of business* |
|---|---|
| Intercap Leasing, Ltd. (hereinafter ICL) .............................. | May 4, 1976 |
| Intercap Leasing, Ltd. 001 (hereinafter ICL 001) ......................... | May 28, 1976 |
| Intercap Leasing, Ltd. 0021 (hereinafter ICL 0021) ....................... | September 1976 |
| Intercap Leasing, Ltd. 7761 (hereinafter ICL 7761) ....................... | June 1, 1977 |
| Intercap Leasing, Ltd. 7771 (hereinafter ICL 7771) ....................... | August 1977 |

Intercap, as the general partner, and Dallas Associates, as the limited partner, owned 1 percent and 99 percent, respectively, of the capital and profits and losses of each of the limited partnerships, with the exception of ICL 7761, which had two limited partners, Dallas Associates (59 percent) and Alamo Associates (40 percent). The limited partnerships and Dallas Associates filed partnership tax returns on a calendar year basis.

Each of the limited partnerships obtained nonrecourse financing from unrelated financial institutions in order to engage in the business of leasing personal property to unrelated entities. The use of separate partnerships to conduct the leasing activities was a condition imposed by the makers of the nonrecourse loans. (The record does not explain the reason for this condition.)

On their joint Federal income tax returns for 1976, 1977, and 1978, petitioners did not report any income, gain, or loss from their partnership interest in Dallas Associates. Upon audit, respondent made certain adjustments to income and loss of the limited partnerships and to Dallas Associates' distributive share from each partnership. Those adjustments are not now disputed by petitioners. Dallas Associates' distributive share of the ordinary income (loss) from the activity of each limited partnership for the years 1976, 1977, and 1978 was determined to be:

| Partnership | Taxable period ending Dec. 31— | | |
|---|---|---|---|
| | *1976* | *1977* | *1978* |
| ICL | $47,697.00 | $154,512.11 | $170,353 |
| ICL 001 | (97,343.68) | 4,830.08 | 7,848 |
| ICL 0021 | (4,353.69) | 4,283.84 | 19,762 |
| ICL 7761 | - - - | (128,205.00) | (785,366) |
| ICL 7771 | - - - | (9,062.00) | (73,181) |
| Total | (54,000.37) | 26,359.03 | (660,584) |

In addition to the foregoing amounts, ICL 001 realized a 1977 gain under sec. 1231; Dallas Associates' distributive share of that gain was $4,460.94.

During the years 1976, 1977, and 1978, Dallas Associates had no items of income, deductions, or credits other than its distributive share of those items arising from its interest in the five limited partnerships.

Respondent also determined that under the at-risk rules of section 465, the proper computation of petitioner's distributive share of gain and loss from Dallas Associates is as follows:

### 1976

| Partnership | 1976 gains and losses | Gains and losses after application of Code sec. 465 | Unused losses carried to subsequent year |
|---|---|---|---|
| ICL | $47,697.00 | $47,697.00 | 0 |
| ICL 001 | (97,343.68) | 0 | ($97,343.68) |
| ICL 0021 | (4,353.69) | 0 | (4,353.69) |

| | | |
|---|---|---|
| Dallas Associates' distributive share | | 47,697.00 |
| Petitioner's interest | | × 30.69% |
| Petitioner's distributive share | | 14,638.21 |

### 1977

| Partnership | 1977 gains and losses | 1977 gains and losses plus 1976 carryovers | 1977 capital gains | Gains and losses after application of Code sec. 465 |
|---|---|---|---|---|
| ICL | $154,512.11 | $154,512.11 | 0 | $154,512.11 |
| ICL 001 | 4,830.38 | (92,513.30) | $4,460.94 | (4,460.94) |
| ICL 0021 | 4,283.84 | (69.85) | 0 | 0 |

1977

| Partnership | 1977 gains and losses | 1977 gains and losses plus 1976 carryovers | 1977 capital gains | Gains and losses after application of Code sec. 465 |
|---|---|---|---|---|
| ICL 7761 | ($128,205.00) | ($128,205.00) | 0 | 0 |
| ICL 7771 | (9,062.00) | (9,062.00) | 0 | 0 |
| Dallas Associates' distributive share | | | $4,460.94 | $150,051.71 |
| Petitioner's interest | | | × 30.69% | × 30.69% |
| Petitioner's distributive share | | | 1,369.05 | 46,050.70 |

As a result of the foregoing computation, respondent computed that petitioner had unused losses to carry to 1978 as follows:

| Partnership | Amount |
|---|---|
| ICL | 0 |
| ICL 001 | ($88,052.36) |
| ICL 0021 | (69.85) |
| ICL 7761 | (128,205.00) |
| ICL 7771 | (9,062.00) |

1978

| Partnership | 1978 gains and losses | 1978 gains and losses plus 1976 and 1977 carryovers | Gains and losses after application of Code sec. 465 |
|---|---|---|---|
| ICL | $170,353 | $170,353.00 | $170,353.00 |
| ICL 001 | 7,848 | (80,204.36) | 0 |
| ICL 0021 | 19,762 | 19,692.15 | 19,692.15 |
| ICL 7761 | (785,366) | (913,571.00) | 0 |
| ICL 7771 | (73,181) | (82,243.00) | 0 |
| Dallas Associates' distributive share | | | 190,045.15 |
| Petitioner's interest | | | × 30.69% |
| Petitioner's distributive share | | | 58,325.00 |

In the notices of deficiency, respondent increased petitioner's taxable income for 1976, 1977, and 1978 to reflect his distributive share of income from Dallas Associates as determined under section 465. A loss carryback from 1978 claimed by petitioner was disallowed, and petitioner's 1975 taxes were

increased by the amount previously refunded to him on a refund application for that year.

On October 4, 1976, after the formation of Dallas Associates and ICL, ICL 001, and ICL 0021, Congress enacted section 465[3]

---

[3]Sec. 465 was added to the Code by Pub. L. 94–455, 90 Stat. 1531, the Tax Reform Act of 1976, and for years 1976, 1977, and 1978, provided:

SEC. 465. DEDUCTIONS LIMITED TO AMOUNT AT RISK IN CASE OF CERTAIN ACTIVITIES.

(a) GENERAL RULE.—In the case of a taxpayer (other than a corporation which is neither an electing small business corporation (as defined in section 1371(b)) nor a personal holding company (as defined in section 542)) engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year. Any loss from such activity not allowed under this section for the taxable year shall be treated as a deduction allocable to such activity in the first succeeding taxable year.

(b) AMOUNTS CONSIDERED AT RISK.—

(1) IN GENERAL.—For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including—

(A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and

(B) amounts borrowed with respect to such activity (as determined under paragraph (2)).

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest for such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who—

(A) has an interest (other than an interest as a creditor) in such activity, or

(B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b).

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar agreements.

(5) AMOUNTS AT RISK IN SUBSEQUENT YEARS.—If in any taxable year the taxpayer has a loss from an activity to which this section applies, the amount with respect to which a taxpayer is considered to be at risk (within the meaning of subsection (b)) is subsequent taxable years with respect to that activity shall be reduced by that portion of the loss which (after the application of subsection (a)) is allowable as a deduction.

(c) ACTIVITIES TO WHICH SECTION APPLIES.—

(1) TYPES OF ACTIVITIES.—This section applies to any taxpayer engaged in the activity of—

(A) holding, producing, or distributing motion picture films or video tapes,

(B) farming (as defined in section 464(e)),

(C) leasing any section 1245 property (as defined in section 1245(a)(3)), or

(D) exploring for, or exploiting, oil and gas resources

as a trade or business or for the protection of income.

(2) SEPARATE ACTIVITIES.—For purposes of this section, a taxpayer's activity with respect to each—

(A) film or video tape,

(B) section 1245 property which is leased or held for leasing,

(C) farm, or

to combat perceived taxpayer abuse of the benefits stemming from the use of nonrecourse financing following the Supreme Court's decision in *Crane v. Commissioner*, 331 U.S. 1 (1947). S. Rept. 94–938, at 46–47 (1976), 1976–3 C.B. (Vol. 3) 49, 83–84. The Supreme Court held in *Crane* that an owner's adjusted basis in a parcel of real property included the amount of a nonrecourse mortgage on the property, under which the mortgagee-lender could seek recovery of its loan only from the property. The *Crane* rule, that the adjusted basis of property includes borrowed amounts paid for the property, permitted taxpayers to generate tax deductible losses in activities in which they personally assumed little or no financial risk. In stating its reasons for proposing section 465, the Senate Finance Committee report of June 10, 1976, noted:

> When an investor is solicited for a tax shelter activity, it has become common practice to promise the prospective investor substantial tax losses which can be used to decrease the tax on his income from other sources. The committee believes that it is not equitable to allow these individual investors to defer tax on income from other sources through losses generated by tax sheltering activities, to the extent the losses exceed the amount of actual investment the taxpayer has placed at risk in the transaction. [S. Rept. 94–938, at 47 (1976), 1976–3 C.B. (Vol. 3) 49, 85.]

Section 465 was thus intended to effectuate Congress' goal of preventing tax shelter abuse by limiting the amount of loss adjustments from a taxpayer's interest in the activities listed in the statute ("at risk" activities) that he may use to reduce his taxable income to the amount of actual economic risk incurred by him in connection with each such activity. When calculating his losses allowable under section 465(a), a taxpayer must separately determine his amount at risk under section 465(b) and his at-risk loss under section 465(d) for each separate at-risk activity in which he is engaged.

---

, (D) oil and gas property (as defined under section 614),
shall be treated as a separate activity. A partner's interest in a partnership or a shareholder's interest in an electing small business corporation shall be treated as a single activity to the extent that the partnership or an electing small business corporation is engaged in activities described in any subparagraph of this paragraph.

(d) DEFINITION OF LOSS.—For purposes of this section, the term "loss" means the excess of the deductions allowable under this chapter for the taxable year (determined without regard to this section) and allocable to an activity to which this section applies over the income received or · accrued by the taxpayer during the taxable year from such activity.

Congress provided, however, that if the taxpayer engages in at-risk activities through a partnership, his interest in the partnership is a single activity for the purpose of calculating loss under section 465. Sec. 465(c)(2). In determining a partnership's loss under section 703 from its interest in at-risk activities, "all of the [at-risk] activities in the same category (*i.e.*, all motion picture films and video tapes) are to be treated as one activity. * * * the loss from the activity for any partner is that partner's loss from the partnership." S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 89. Thus, the partnership nets the losses and gains from the at-risk activities that are of the same type when determining each partner's distributive share of tax incidents under section 702.[4]

Respondent agrees with petitioner's argument that if Dallas Associates were conducting the five equipment leasing activities itself, petitioner would be entitled to have Dallas Associates offset the gains from some of its leasing activities against the losses from the other leasing activities and distribute to its partners their shares of that net amount. Respondent contends, however, that aggregating activities at the partnership level under section 465(c)(2) is a benefit accorded by section 465 only to partnerships actively conducting at-risk activities; because Dallas Associates functions as a mere investing partnership, it should be disregarded for purposes of applying section 465 in this case. Consequently, respondent concludes, petitioner has an interest in each of the five limited partnerships and thus has five at-risk activities, some of which incurred losses that petitioner may not currently deduct under section 465 and some of which had gains that petitioner must report as income.

Neither section 465 as written nor the legislative history supports respondent's position that Dallas Associates is not a "partnership" within the meaning of section 465(c)(2). Subsec-

---

[4]We do not here address the situation of a partnership's gain or loss from the conduct of different types of at-risk activities. The language of sec. 465(c)(2) permits aggregation of activities "described in any subparagraph of this paragraph," i.e., subpar. (A), (B), (C), or (D). The legislative history documents the intent of Congress to allow aggregation only of like-kind at-risk activities, as the following language indicates:

"All equipment leasing activities engaged in through a partnership or subch. S corporation will be treated as one activity under this provision. However, if the partnership or corporation engages in more than one type of activity covered by the the at risk rule, then each type of activity is treated as a separate activity. [Staff of Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 93.]"

tions 465(a) and 465(c) refer to taxpayers and partnerships "engaged in" at-risk activities without distinguishing between taxpayers or partnerships that actively conduct the at-risk activity and those that merely invest in an at-risk activity.[5] The language of the Senate report quoted by respondent to support his argument that a partnership must be actively conducting business to be able to aggregate same-category activities, viz, "partners in a partnership which conducts an activity described in this provision," was used by the Senate Finance Committee to describe the taxpayers limited by the provisions of section 465(a)[6] and not to exclude investing partnerships from section 465(c)(2). The Senate Finance Committee reported 465(c)(2). The Senate Finance Committee reported that "the limitation [of section 465] applies to all taxpayers (other than corporations which are not subchapter S corporations) including * * * partners in a partnership which conducts an activity described in this provision." S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 86. If we were to interpret that language as excluding investing partnerships, as respondent requests, we would remove petitioners from the category of persons affected by section 465. Such interpretation would indeed be contrary to that intended and enacted by Congress.

Similarly, respondent has not cited and we have not found any statute or case that would justify ignoring the existence of Dallas Associates for tax purposes under the facts in this case. The question of when a partnership will be recognized for tax purposes was considered by the Supreme Court in *Commissioner v. Culbertson*, 337 U.S. 733 (1949), in which the Court held that a partnership exists for Federal income tax purposes when "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." 337 U.S. at 742. Since *Culbertson*, various courts, including this Court and the Court of Appeals for the Fifth Circuit, to which this case is appealable, have recognized the viability for tax purposes of a first-tier partnership that served

---

[5]By contrasts, pars. 465(c)(3) and 465(c)(4), which were added by Pub. L. 95–600, 92 Stat. 2814, the Revenue Act of 1978, specifically use the term "actively" to create a distinction between active conduct and passive investment in at-risk activities.

[6]Because Dallas Associates is not a taxpayer, the counting of activities must occur at petitioner's level, and he has an interest in only one partnership.

as a holding arrangement for interests in second-tier partnerships actively conducting business where there was no improper assignment of income. See *Klein v. Commissioner*, 18 T.C. 804 (1952); *United States v. Atkins*, 191 F.2d 146 (5th Cir. 1951).[7] Such is the case here.

Nonetheless, respondent argues that to permit Dallas Associates to net the gains and losses from the limited partnerships' activities defeats the intent of Congress in enacting section 465. The section, however, was enacted to prevent individual investors from deferring "tax on income from other sources through losses generated by the sheltering activities." S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 85. Petitioners herein did not attempt to use the losses from their interest in Dallas Associates to reduce their taxable income from other sources; none of their distributive share of loss from Dallas Associates was reported on their returns. The express language of the statute permits a partner's investment in a partnership to be treated as a single activity to the extent of the partnership's interests in at-risk activities of the same type, and that exception is not limited as respondent here seeks to limit it.

Accordingly, under section 465, Dallas Associates may net the gains and losses from its interests in second-tier partnerships in determining petitioners' distributive share of gain or loss from Dallas Associates, and petitioner may treat his interest in Dallas Associates as a single· activity.

To reflect petitioners' concessions,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

SIMPSON, STERRETT, GOFFE, WILES, CHABOT, SHIELDS, CLAPP, and SWIFT, *JJ.,* agree with this opinion.

JACOBS, *J.,* did not participate in the consideration of this case.

---

[7]The Internal Revenue Service has also recognized the viability for tax purposes of a first-tier partnership that functioned exclusively as a holding company. See Rev. Rul. 78–2, 1978–1 C.B. 202.

DAWSON, *Chief Judge*, concurring: I concur in the result reached in this case. However, I think further analysis of section 465 may be helpful.

The focus of this case is on that portion of section 465(c)(2) which provides that—

A *partner's* interest in a partnership * * * shall be treated as a single activity to the extent that the *partnership* * * * *is engaged in activities* described in any subparagraph of this paragraph. [Emphasis added.]

It is upon the "express language" of this provision that the majority base their opinion. However, I do not think that such language alone is sufficient.

In attempting to apply the above passage of section 465(c)(2), a number of questions arise. The first is, in the context of two-tier partnerships, who is the "partner" to whom this sentence of section 465(c)(2) refers? Is the "partner" the petitioner or is it Dallas Associates? I think it must be petitioner.

Under section 465(a), the "at risk" provisions apply—

In the case of a *taxpayer* (other than a corporation which is neither an electing small business corporation * * * nor a personal holding company * * *) engaged in an activity to which this section applies * * * [Emphasis added.]

Thus, the "partner" to whom reference is made in section 465(c)(2) must be the "taxpayer" who is subjected to the "at risk" rules under section 465(a), because one arrives at the specific provision of section 465(c)(2) only by beginning at section 465(a).

Although a partnership is a person as defined in section 7701(a)(1) and, arguably, for some purposes, it may be a taxpayer as defined in section 7701(a)(14)[1]—"any person subject to any internal revenue tax,"—it is not a taxpayer for purposes of the income tax. Section 701 provides that a partnership "shall not be subject to the income tax." For purposes of determining the income tax of its partners, as in the present situation, a partnership must be treated as an aggregate of its partners.[2]

---

[1]For example, a partnership may be subject to employment tax under sec. 3221(a).

[2]In A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, sec. 51.03, at 51–5 to 51–6 (3d ed. 1982), the authors state the following:

"Partnerships are not specifically included in the designated classes of taxpayers intended to be

Furthermore, although Congress used the broad term "taxpayer" in section 465(a), Congress did not intend that section 465 apply to a partnership as an entity. For example, if we assume in the instant case that all the partners in Dallas Associates were subchapter C corporations, section 465 would not be applicable (even as to the partnership of Dallas Associates), because such corporations are specifically excluded from the application of section 465.

Since, except for subchapter S corporations and personal holding companies, this provision does not limit the deductibility of amounts paid or incurred by corporations, *the provision would not apply to a partnership in which all the partners are corporations* (other than subchapter S corporations or personal holding companies). Similarly, if a partnership is comprised of both individual partners and corporate partners (other than subchapter S corporations and personal holding companies), the at risk provision applies to the individual partners but not the corporate partners. [Staff of Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 36 n. 2, 1976–3 C.B. (Vol. 2) 1, 48; emphasis added.]

See also H. Rept. 94–1515, at 412 n. 1 (1976). Therefore, in this case, the words "taxpayer" in section 465(a) and "partner" in section 465(c)(2) refer to the petitioner, while the word "partnership" in section 465(c)(2) refers to Dallas Associates.

The next question that arises is whether Dallas Associates "is engaged in [the] activit[y]" of leasing any section 1245 property as provided in section 465(c)(2). Dallas Associates is not directly conducting an activity of leasing section 1245 property; it is directly conducting a business of holding partnership interests. For the reasons previously stated, section 465(c)(2), itself, cannot be used to solve the question of whether, for purposes of section 465, Dallas Associates is considered to be engaged in the activities of the second-tier partnerships because section 465(c)(2) does not apply to Dallas Associates as a partner in the second-tier partnerships. Instead, I think it is necessary to look to the provisions of subchapter K.

Section 702(a)(7) and the regulations thereunder[3] require

---

covered by §465. However, that is not a drafting omission. Partnerships are not taxpayers but are a focal point for the collection of required tax information. The partners are the taxpayers. * * *"

[3]SEC. 702. INCOME AND CREDITS OF PARTNER.

(a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

Dallas Associates to take into account separately its distributive share of each of the second-tier partnerships' income or losses from leasing activities. Thus, the character of such income or loss would be retained as income or loss from leasing activities under section 702(b).[4] In computing the taxable income of the second-tier partnerships, the income or loss from the leasing activities would be separately stated under section 703(a)(1).[5]

Therefore, through the operation of these partnership provisions, Dallas Associates would be treated as having income or loss from five leasing activities of the five second-tier partnerships and, thus, would be treated for section 465(c)(2) purposes as engaged in five leasing activities.[6] I think that it is only after one applies the provisions of subchapter K to characterize the leasing activities of the second-tier partnerships as those of the first-tier partnership that the clear language of section 465(c)(2) permits the gains from the leasing activities to be netted against the losses from leasing activities. Absent a compelling reason to disregard the plain language of the statute, we must assume that Congress meant what it said and that the statutory language should be taken at face value.

In addition, it seems to me that, respondent was asking the Court to "look through" Dallas Associates and, for purposes of section 465(c)(2) only, to treat petitioner's interest in Dallas Associates as an interest in each of the second-tier partner-

* * * * * * *

(7) other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary * * *

Sec. 1.702–1(a)(8)(ii), Income Tax Regs., provides, in part, the following:

"Each partner must also take into account separately his distributive share of any partnership item which if separately taken into account by any partner would result in an income tax liability for that partner different from that which would result if that partner did not take the item into account separately. * * *"

[4]SEC. 702(b). CHARACTER OF ITEMS CONSTITUTING DISTRIBUTIVE SHARE.—The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (7) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

[5]SEC. 703. PARTNERSHIP COMPUTATIONS.

(a) INCOME AND DEDUCTIONS.—The taxable income of a partnership shall be computed in the same manner as in the case of an individual except that—

(1) the items described in section 702(a) shall be separately stated * * *

[6]Respondent should have no objection to this conclusion, since, by analogy, Rev. Rul. 73–360, 1973–2 C.B. 293, reaches a similar result.

ships directly. If petitioner had not interposed Dallas Associates between himself and the second-tier partnerships, it seems that he could not have offset the gains against the losses of the second-tier partnerships.[7]

The Commissioner has taken a similar position in Rev. Rul. 78–2, 1978–1 C.B. 202. In order to address the complicated issue of whether the optional adjustment to basis provisions of section 743(b) apply to both tiers of a two-tier partnership when there is a sale or exchange of a partnership interest in the first-tier partnership, the Commissioner states as follows:

> For purposes of sections 743 and 754 of the Code, a sale or exchange of an interest in $X$ [first-tier partnership] or the death of a partner of $X$ is considered to result in an adjustment to the basis of the property of $Y$ [second-tier partnership] *as though the transferee partner were a partner of Y.* [Rev. Rul. 78–2, *supra*, 1978–1 C.B. at 202; emphasis supplied.]

Thus, in Rev. Rul. 78–2, the Commissioner treats an interest in a first-tier partnership as though it were an interest in the second-tier partnership directly.[8] I use Rev. Rul. 78–2 not as authority, but merely to illustrate that respondent's position here is not unreasonable. I am reluctant to preclude the possibility of our holding in an appropriate case that a first-tier partnership must be "ignored" or "collapsed" for a specific purpose. The Commissioner and this Court are just beginning to address the complex issues which will surely arise with regard to multi-tier partnerships and the Code does not easily accommodate complex partnership structures, as evidenced by the instant case. Although I reach the same conclusion as the majority here, I am unwilling to completely block an avenue that I think should remain open.

FAY and HAMBLEN, *JJ.*, agree with this concurring opinion.

---

NIMS, *J.*, dissenting: The majority's holding has the potential for opening a substantial loophole. It is undisputed that

---

[7]The express language of the sentence of sec. 465(c)(2) that is under consideration here permits netting of losses and gains arising within *one* partnership.

[8]The majority opinion states that in Rev. Rul. 78–2, the Commissioner has "recognized the viability for tax purposes of a first-tier partnership that functioned exclusively as a holding company." Majority opinion at p. 756 note 7. In my judgment, as stated above, the position of respondent in this case is consistent with that propounded in Rev. Rul. 78–2. For a discussion of Rev. Rul. 78–2, see Hall, "Tier Partnerships—Special Problems," 59 Taxes 813 (1981).

petitioner would be prohibited by section 465 from aggregating direct holdings in five separate partnerships. However, under the majority's ruling, a taxpayer similarly situated may now aggregate such holdings by the simple expedient of conveying them to a holding company partnership like Dallas Associates.

The "flush" language at the end of section 465(c)(2) provides that "a partner's interest in a partnership * * * shall be treated as a single activity to the extent that the partnership * * * is engaged in activities described in [section 465(c)(2)]." Dallas Associates is unquestionably a "partner," and if any one of the partnerships, such as ICL 001, in which Dallas Associates is a partner, were engaged in multiple activities, Dallas could aggregate those activities as a "single activity." But Dallas Associates, qua partner, should no more be able to aggregate the activities of the five separate partnerships than petitioner could do if he were a partner directly in such partnerships.

Section 465 may be initially puzzling because it disallows the aggregation of like-kind section 465 activities directly engaged in by a taxpayer while the "flush" language concurrently allows the aggregation of such activities if they are carried on together in a partnership. The purpose for permitting this apparent peculiarity, however, becomes quite obvious when one considers the application of the at-risk rules of section 465 to an operating partnership without the existence of the "flush" language. If aggregation were *not* permitted when activities were carried on in partnership form, the partnership would then be required to specify on each partner's Schedule K-1 the at-risk amount for each activity engaged in by the partnership.

For example, if a partnership invested in 50 separate leasing transactions, it would have to provide a breakdown of the at-risk amounts for each separate leasing transaction on each Schedule K-1 for each partner. The obvious intent of the "flush" language was to save operating partnerships from the unreasonable accounting and administrative burdens of providing such information.[1]

This rationale does not justify the majority's extension of the "flush" language of section 465(c)(2) to a holding company

---

[1]See generally A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, par. 57.02 (1982).

partnership like Dallas Associates. No conservation of accounting effort is achieved in the instant case by permitting aggregation because each of the second-tier partnerships must, in any event, issue a separate Schedule K-1. Because neither the language nor the obvious intent of section 465 permits aggregation in the case before us, we should not sanction it.

PARKER, *J.*, agrees with this dissent.

---

WHITAKER, *J.*, dissenting: I must dissent from the result which the majority reaches in this case since, in my opinion, it has stretched section 465 beyond its permissible limit.

Section 465(c) says, so far as relevant to the instant case:

(1) TYPES OF ACTIVITIES.—This section applies to any taxpayer engaged in the activity of—

\* \* \* \* \* \* \*

(C) leasing any section 1245 property (as defined in section 1245(a)(3)),

\* \* \* \* \* \* \*

(2) SEPARATE ACTIVITIES.—For purposes of this section, a taxpayer's activity with respect to each—

\* \* \* \* \* \* \*

(B) section 1245 property which is leased or held for leasing,

\* \* \* \* \* \* \*

shall be treated as a separate activity. A partner's interest in a partnership \* \* \* shall be treated as a single activity to the extent that the partnership \* \* \* is engaged in activities described in any subparagraph of this paragraph.

The Senate Finance Committee explains this Code section in part in the following language:

In general, in the case of an activity engaged in by an individual, each motion picture film or video tape, item of leased equipment, farm, or oil and gas property is treated as a separate activity. However, in the case of a partnership or subchapter S corporation, all of the activities in the same category (*i.e.*, all motion picture films and video tapes) are to be treated as

one activity. Thus, the loss from the activity for any partner is that partner's loss from the partnership * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

This "at risk" limitation applies to all individual taxpayers who invest in an equipment leasing activity, including both individuals who invest for their own account and those who do so through another entity such as a partnership or a subchapter S corporation. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Under the at risk rule as it applies to equipment leasing, the taxpayer is considered to be in a leasing activity if he has an ownership interest, either direct or indirect, in section 1245 property (as defined in sec. 1245(a)(3)) which is leased or held for leasing. * * *
    [S. Rept. 94–938, at 51, 85 (1976), 1976–3 C.B. (Part 3) 89, 123. Fn. ref. omitted.]

It is my opinion that the merging or netting of section 465 activities is only to be permitted within the confines of a single partnership which is actually carrying on the activities, and then only with regard to similar section 465 activities.[1] The difficult issue which the majority happily ignores is whether the aggregation rules under section 465(c)(2) should apply to the investment partnership so that this netting can be allowed with respect to the losses realized by an investment partnership from its investments in operating partnerships. This issue is not resolved by merely insisting upon recognizing the existence of Dallas, the first-tier partnership, as a partnership.[2] I agree with the majority that Dallas should be recognized as a partnership; I disagree, however, that its losses from its investments in five separate limited partnerships may be netted. To do this is to ignore the separate existence of the five second-tier partnerships.

A slight variation of the facts of the instant case serves better to illustrate the application of section 465(c)(2). Let us assume that Dallas, the investment partnership, has a limited partnership interest in only two limited partnerships, ICL and ICL 001. Let us further assume that ICL has a single

---

[1] Where a partnership engaged in dissimilar types of sec. 465 activities, however, it is considered to be engaged in separate activities as to each, "and a separate application of the at risk limitation must be made for each of the two activities." S. Rept. 94–938 (1976), 1976–3 C.B. (Part 3) 124.
    [2] The majority and concurrence assume as a factual matter that Dallas holds several different entities for a substantial non-tax purpose.

equipment leasing activity but that ICL 001 is engaged in leasing two separate properties. There is nothing in the Code which permits consolidation of the activities of separate partnerships. Thus, the gains and losses from ICL and from ICL 001 cannot be combined at that level, although it is clear that the gains and losses from the two equipment leasing activities carried on by ICL 001 can be amalgamated and are to be treated as a single activity in the hands of each of its partners under section 465(c)(2). If we further assume that ICL realizes gains and that the amalgamation of the two activities of ICL 001 results in a net loss, Dallas would have a gain from one partnership and a loss from the other.

The majority allows petitioner, as the partner in first-tier Dallas, again to amalgamate its gains and losses from the two second-tier partnerships. In order to do this, one must characterize Dallas as a separate entity rather than an aggregation of its partners. In this respect, the majority and concurring opinion fall into inconsistency.

The majority by implication and the concurring opinion expressly reach their result by applying sections 702(a)(7) and 702(b) to maintain in the hands of Dallas the character of the gains and losses realized by the second-tier operating partnerships. Section 702(a)(7) only applies to preserve the character an item would have in the hands of the operating partnership if by reason of such characterization the item could affect the taxpayer's tax liability.[3] Therefore, to reach the result that items are separately stated for section 702(a)(7) purposes, the majority and concurring opinion must look through Dallas, the partnership, to find a taxpayer, i.e., petitioner. In effect, Dallas is treated as an aggregation of its partners rather than a separate distinct entity. With this, I agree. This is consistent with section 465(c)(1), which directs us to look to section 1245 property and then ascertain whether the taxpayer has either a direct or an indirect interest in it.[4] But we must consistently apply the aggregate concept, not only in the characterization of the gains and losses which flow up to petitioner but also in

---

[3]Sec. 703(a)(1) does not raise Dallas to the status of an individual taxpayer for the purpose of computing tax liability but only for computing taxable gross income for distribution purposes. As a result, the only way, under the regulations of sec. 702, to require that items be separately stated is to apply such a test to petitioner's tax liability potential.

[4]By looking through Dallas again, we see that petitioner indirectly owns the leased property and thus is engaged in the equipment leasing activities of the second-tier partnerships.

viewing his leasing activities. When we do that, we find that petitioner, one of the aggregate partners that comprise Dallas, must be treated under section 465(c)(2) as engaged in the activities of five separate partnerships. He merely steps into Dallas' shoes to the extent of his partnership interest. This is consistent with the structure of section 465 because the limitations imposed therein are only applicable to taxpayer-partners in their aggregate capacity. The majority and the concurring opinion, on the other hand, after applying the aggregate concept to the second-tier gains and losses then apply the entity concept so as to place Dallas constructively in the activities of its limited partnerships. In so doing, that part of the legislative history is ignored which directs one to tie the taxpayer indirectly into the section 1245 property, in effect for this purpose to look through Dallas. Therefore, in my judgment, such amalgamation under section 465(c)(2) is to be permitted only with respect to activities that are engaged in by one of the five separate partnerships and not with respect to gains and losses from activities of the investment partnerships that should be analyzed as an aggregation of its partners. It is judicial legislation for us to add to the statute a concept which is not there either by expressed statutory language or expressed legislative intent and which actually is contrary to the stated purpose of the provisions of section 465.

I would therefore hold that through Dallas as a limited partner in each of the five second-tier partnerships, petitioner to the extent of his partnership interest was engaged in the separate activities of five different partnerships and is not allowed to net the profits and losses received from these five separate partnerships for purposes of determining his distributive share of the gains or losses. It follows that respondent's determination should be sustained.

WILBUR, PARKER, and KÖRNER, *JJ.*, agree with this dissent.