RICHARD C. CAPEK AND JOY ANN CAPEK, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 27834-82, 25003-83, 479-84, 6754-84.    Filed January 21, 1986.

*Robert Weber*, for the petitioners.

*Thomas C. Borders* and *William E. Bogner*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

---

[1]Cases of the following petitioners were consolidated herewith: Gene Croci and Mary Croci, docket No. 25003-83; Paul A. Reaume and Alice May Reaume, docket No. 479-84; Arthur J. and Margie R. Spiller, docket No. 6754-84. However, in docket Nos. 25003-83 and 6754-84, the Court severed and tried, in accordance with the agreement of the parties, only the issue as to whether the petitioners were at risk within the meaning of sec. 465(b), I.R.C. 1954, with respect to their investments in the Price Coal leasing program.

| Petitioners | Taxable year | Deficiency |
|---|---|---|
| Richard C. Capek and Joy Ann Capek | 1978 | $22,471.00 |
| Gene Croci and Mary Croci | 1981 | 14,323.00 |
| Paul A. Reaume and Alice May Reaume | 1979 | 11,695.57 |
| | 1980 | 25,114.23 |
| Arthur J. Spiller and Margie R. Spiller | 1980 | 8,440.00 |
| | 1981 | 10,748.00 |

The issues for decision are: (1) Whether petitioners Capek and Reaume engaged in their coal mining activities with a profit objective within the meaning of section 183 of the Internal Revenue Code of 1954;[2] (2) whether advanced royalties "paid" by petitioners Capek and Reaume constitute advanced minimum royalties within the meaning of section 1.612–3(b)(3), Income Tax Regs.; and (3) whether petitioners Croci and Spiller were at risk within the meaning of section 465(b) with respect to their investments in the Price Coal leasing program.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

Petitioners Richard C. and Joy Ann Capek are husband and wife, who maintained their legal residence in Downers Grove, Illinois, at the time of the filing of their petition herein. Petitioners Paul A. and Alice Mae Reaume are husband and wife, who maintained their legal residence in Lake Forest, Illinois, at the time of the filing of their petition herein. Petitioners Gene and Mary Croci are husband and wife, who maintained their legal residence in Highland Park, Illinois, at the time of the filing of their petition herein. Petitioners Arthur J. and Margie R. Spiller are husband and wife, who maintained their legal residence in Waukegan, Illinois, at the time of the filing of their petition herein. All of the petitioners filed timely joint Federal income tax returns for the taxable years involved

---

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

with the Internal Revenue Service Center, Kansas City, Missouri.

Price Coal & Energy, Inc. (Price Coal), an Illinois corporation, was incorporated on November 23, 1977. For all times relevant to these cases, its outstanding capital stock has been owned by Rodman G. Price (Mr. Price) and his wife, Diane Price. From its date of incorporation and for all times relevant to these cases, Mr. Price has been the president and a director of Price Coal, and Mrs. Price has been the secretary and a director of such corporation. Mr. Price graduated in 1949 from Hobart College with a degree in economics and is a "private investment banker, specializing in tax shelters."

Great American Royalties, Inc. (Great American), a North Dakota corporation, was incorporated in 1957. The articles of incorporation of Great American provide in part that it was formed for the "purchasing and leasing of lands, and royalty and mineral interests therein, believed to contain oil, gas and other minerals, the improving, mortgaging, leasing, assigning and otherwise disposing of the same." In 1977, and for all times relevant to these cases, the officers of Great American were president, Melvin (Pat) Ballantyne; vice president, Russell Ballantyne; and secretary, Todd Ballantyne.

Rodman G. Price, Ltd. (Price Ltd.), a North Dakota corporation, was incorporated on January 24, 1979. The incorporators and directors listed on the articles of incorporation were Mr. Price, Diane R. Price, and Rodman M. Price.

Price Coal entered into a coal purchase agreement dated November 1, 1977, with Great American. This agreement gave Price Coal an option to acquire up to 100 million tons of in place strippable lignite coal located in western North Dakota "out of leases and acreage selected by" Great American for 29.97 cents per ton. As consideration for the option, the agreement required Price Coal to pay Great American $5,000.

Sometime late in 1977, Mr. Price, with the assistance of Melvin and Todd Ballantyne, prepared a promotional booklet describing the 1977 Price Coal coal leasing program (the 1977 program). The booklet contains copies of the following

documents: lease instructions, mining lease, addendum to mining lease, contract for sale of coal, nonrecourse promissory note, promissory note, and an authorization to negotiate. The booklet also contains a summary of the program, a legal opinion, and a geologist's report. The 1977 booklet contains no projections of profit that an investor might be expected to realize.

The 1977 booklet explained that an investor subleasing lands warranted to contain 300,000 tons of coal was entitled to deduct the $45,000 "advance royalties" as a business expense on Schedule C of his 1977 Federal income tax return. A sample Schedule C illustrating the mechanics of this deduction was included in the booklet. The summary of the 1977 program contained in the booklet described the anticipated deduction as follows: "For 1977, Lessee will report on his Federal Income Tax Return, as a business expense, a deductible royalty payment of $4.00 for every $1.00 of a personal investment funds."

The 1977 booklet states that Price Coal is the "owner of one hundred (100) million tons of coal in North Dakota." Although Price Coal had an option to acquire up to 100 million tons of strippable lignite coal reserves from Great American, it never obtained any coal lands under this option until February 25, 1978, when it received an assignment of a lease of 94.88 coal acres, known as the Knox lease. There is no indication in the assignment of how many tons of coal were estimated to be contained in such leased land. Most of the investors in the 1977 program were assigned subleases in the Knox lease, extending for 10 calendar years plus the remainder of 1977. However, in February 1984, Price Coal filed a release of the Knox lease with the Recorder of Deeds in Williams County, North Dakota, thereby releasing any claim to such property. Price Coal had a right of substitution, but there is no credible evidence that other property was substituted for the Knox lease.

The legal opinion in the 1977 program booklet is signed by Richard B. Thomas, an attorney with offices in Minot, North Dakota. The first paragraph of this opinion letter states as follows: "You have informed us that Price Coal & Energy, Inc. owns a lease on land containing coal resources

and wishes to sub-lease the land to others under terms and conditions set forth below." Mr. Price provided Mr. Thomas with the information relied upon in preparing the legal opinion.

The geologist's report in the 1977 booklet was prepared by Ira M. Tillotson, an engineer registered in the State of Montana, and begins as follows: "This letter report attempts to evaluate and summarize certain of your coal leases in Dunn, McLean, Grant, Hettinger, McKenzie, Stark, Burke, Williams, Ward, and Morton Counties, North Dakota, attached hereto as Appendix A, by leases." Price Coal has never owned any leases in Grant, Hettinger, McKenzie, Stark, Burke, Ward, or Morton Counties.

The booklet prepared for prospective investors in the 1978 coal leasing program (the 1978 program) is substantially similar to the 1977 program booklet. It, too, contains a one-page summary as to how the coal leasing program is intended to operate, which concludes with the statement that the investor will be entitled to a deduction of $4 for every $1 of personal investment funds. It, too, contains no projections of profit that an investor might be expected to realize.

In 1978, petitioner Richard Capek was one of 33 investors who entered the 1978 program. He holds an MBA degree from Northwestern University and is president of his own civil engineering firm. The letter of intent and lease instructions executed by Mr. Capek were dated December 29, 1978.

The lease instructions for the 1978 program contained the following schedule to aid investors in determining the amount to invest:

| 1/4 of first year's royalties | First year's royalties (1977 writeoff) | Tons |
|---|---|---|
| $11,250 | $45,000 | 300,000 |
| 16,875 | 67,500 | 450,000 |
| 33,750 | 135,000 | 900,000 |
| 56,250 | 225,000 | 1,500,000 |

Mr. Capek chose to purchase one unit which ostensibly entitled him to mine 300,000 tons of coal.

The mining lease (which was actually a sublease) executed by Mr. Capek entitled him to mine all of the "economically

recoverable" coal on an undefined portion of real estate owned or leased by Price Coal for a period of 5 calendar years plus the balance of 1978. The lease could also be extended for additional 5-year terms for the life of the underlying coal lease, which the booklet represented was held by Price Coal.

In consideration for entering into the mining lease, Mr. Capek agreed to pay a lease deposit of $1,000 along with the following royalties:

6. *Royalties.* The Lessee shall pay as rental for said coal and mining rights and privileges hereby leased, a royalty of the greater of (1) 15% of the net pit price plus $1.00 per ton of 2,000 pounds of run-of-mine merchantable coal hereby leased or (2) $2.00 per net ton of run-of-mine merchantable coal hereby leased and which is sold from said premises; provided, however, that Lessee shall pay as rental for said mining rights and privileges hereby leased, a royalty of $1.50 per net ton of the initial 150,000 tons sold or mined, removed and marketed.

(a) *Advanced Minimum Royalties.* Lessee will be required to pay Lessor an advanced minimum royalty of $45,000.00 per year. The minimum annual royalty payment herein provided for shall be recoupable at the rate of $1.50 per ton of coal sold or mined, removed or marketed. The minimum annual royalty for the first lease year is payable upon execution of the lease. The minimum annual royalty for each subsequent year for years 2–5 hereof shall be payable on the successive anniversary dates of the execution hereof. All royalty payments made to Lessor will have a cumulative effect with reference to the requirement of paying the minimum annual royalty payments. Therefore, any royalty paid by Lessee will be applied towards the annual minimum royalty payment required. Minimum royalties are non-refundable.

(b) In the event that the Lessee shall sell coal in place by way of a carved-out production payment or otherwise, Lessee will be obligated to pay Lessor a royalty payment to the same extent as if the coal had been mined, removed and marketed. Such royalties shall be due and payable within eighteen months of the date on which the contract creating the production payment is made.

The abstract of instrument executed by Mr. Capek stated that the leased land was located in Williams County, North Dakota.

Mr. Capek also executed an addendum to mining lease, which also bears the date December 29, 1978. This addendum provides that the minimum annual royalty payments due on December 31, 1980, and thereafter could be paid by "cash or note." The addendum set forth the required form for the note, which was (in part) as follows:

> The undersigned promises to pay Price Coal and Energy, Inc., FORTY-FIVE THOUSAND DOLLARS with interest at 8% per annum from date thereof.
>
> This is a non-recourse note. Payments to be made to payee from all coal mined, in excess of the initial 60,000 tons, on the basis of $2.00 per ton of coal sold or mined, removed and marketed from the Leased Premises.

The form note did not specify a time for payment.

Mr. Capek paid one-quarter of the $45,000 advanced minimum annual royalty for 1978 with his own check dated December 30, 1978, in the amount of $11,250. He purported to borrow the remaining $33,750 at 8-percent annual interest from Price Ltd. by means of a nonrecourse promissory note dated December 29, 1978. The note was due on December 31, 1998. By its terms, the note also covered any additional amounts loaned to Mr. Capek by Price Ltd. in 1979. Payments on the nonrecourse note were to be made from Mr. Capek's proceeds from the coal lease. Collateral for the loan was all coal leased to Mr. Capek by Price Coal in excess of 60,000 tons.

Mr. Capek as "Seller" also entered into a contract for the sale of coal dated December 29, 1978, with Price, Ltd. ("Buyer"), under which he was to sell 60,000 tons of coal resources to Price Ltd. at $2.50 per ton. This sale was said to constitute the creation of a "carved-out production payment." Payment was to be made on December 31, 1988, although Price Ltd. could extend the due date an additional 10 years upon agreeing to pay 8-percent interest per annum on the principal balance. The contract specified that payments of principal and interest were to be made exclusively from the receipts of coal mined and marketed. The contract also stated:

> 3. As additional inducement for the Seller's entering into this contract, Buyer hereby agrees to lend Seller $33,750.00 to be repaid under the terms of the non-recourse promissory note attached hereto as Exhibit B, and further agrees to lend another $33,750.00 to Seller in 1979.
>
> 4. Buyer is entitled to the net proceeds from the initial 60,000 tons of coal mined from the Leased Premises.
>
> 5. Buyer agrees to commence mining as soon as practicable.

Mr. Capek also executed an undated document captioned "Authorization to Negotiate." The authorization states that

a check would be drawn by Price Ltd. in the amount of $33,750 payable to Mr. Capek and that Mr. Price was thereby authorized to negotiate and deliver such check to Price Coal as payment for the royalties due under the terms of the mining lease between Mr. Capek and Price Coal. However, Mr. Capek never received any loan proceeds, and there is no evidence that a check was ever drawn by Price Ltd. on behalf of Mr. Capek or on behalf of any other investor in the 1978 program; nor is there any evidence that any such check was given to Price Coal for the advanced minimum royalty of Mr. Capek or any other sublessee.

Mr. Price caused a revised promotional booklet to be prepared, describing the modified leasing program offered in 1979 and 1980 (the 1979–80 program). These revisions were undertaken in an attempt to comply with section 465(c)(3), which extended the at risk rules to the type of activity at issue herein.[3] The prices charged investors were also changed.

The program was summarized in the 1979–80 program booklet as follows:

### SUMMARY

1. Price Coal and Energy, Inc., the owner of one hundred seventy-five (175) million tons of coal in North Dakota, will sublease to Lessee for $1.50 per ton with an advanced minimum annual royalty payment covering 1/5 of the estimated reserves.

2. Lessee will borrow $41,250.00 from Coal Funding Corporation by signing a recourse promissory note.

3. Lessee will execute [an] Authorization to Negotiate, granting Rodman G. Price the authority to endorse and deliver checks from Coal Funding Corporation to Price Coal and Energy, Inc.

4. Lessee will pay upon execution of the lease the advanced minimum royalty for 1979 in the amount of $55,000.00.

5. For 1979, Lessee will report on his Federal Income Tax Return, as a deductible business expense, an amount equal to the advanced minimum royalty payment.

6. For the four years succeeding 1979, lessee will pay advanced minimum annual royalties in the amount of $55,000.00 and report as a deductible business expense, the amount of the advanced minimum royalty payment.

---

[3] Sec. 465(c)(3) was added to the Code by sec. 201(a) of the Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2874, and is applicable for taxable years beginning after Dec. 31, 1978.

The 1979–80 promotional booklet contains no projections of profit that an investor might be expected to realize.

Coal Funding Corp. (Coal Funding) was incorporated in the State of North Dakota on December 31, 1979, by three friends of Mr. Price: Paul Bird, Charles Papousek, and C. Daren Hickey. Mr. Hickey also helped Mr. Price structure the 1979–80 program and invested in the program himself in both 1980 and 1981. Coal Funding has never had any employees. The articles of incorporation were prepared and notarized by Mary Jane Lippert, an attorney who also assisted Mr. Price in structuring his 1979–80 program. Ms. Lippert also prepared the legal opinion included in the 1979–80 and 1980–81 program booklets.

The role of Coal Funding in the restructured Price Coal leasing program was as follows: Every investor (sublessee) entering the program paid one-quarter of the advanced royalty due under the mining lease in cash. The sublessee also executed a recourse note in favor of Coal Funding for three-quarters of the advanced royalty. At the same time, Coal Funding agreed, by a document captioned "Loan Agreement," to lend the sublessee an amount equal to the entire amount of the advanced royalties that was due to Price Coal under the terms of the mining lease. For each year the sublessee remained in the program and actually paid in cash one-quarter of the royalty due under the lease to Price Coal, the sublessee again executed a note in favor of Coal Funding in an amount equal to three-quarters of the royalty due under the lease. The sublessee's signature on the note was obtained by Mr. Price and others acting on behalf of Price Coal. There is no evidence that the officers of Coal Funding ever met with the sublessee to whom it was purportedly lending money, ever conducted any credit investigation of its borrowers, or kept any independent record of either the amounts lent or the amounts that it was obligated under the loan agreements to lend in the future. Coal Funding relied exclusively upon Price Coal to make its decisions in these matters. The notes signed by investors in favor of Coal Funding were retained by Mr. Price in his office.

The authorization to negotiate, signed by each investor and included in the promotional booklets for the 1979–80

and subsequent programs, authorizes Mr. Price to endorse checks drawn by Coal Funding in the sublessee's name and to accept the check as payment for the royalty that the sublessee is obligated to pay to Price Coal. Although Coal Funding agreed to lend the sublessee substantial sums of money under the terms of the recourse promissory notes and loan agreements, no money actually changed hands. It issued no checks on any investor's behalf to Price Coal.

Coal Funding was not aware of the amount of money that it purportedly lent to sublessees in the Price Coal program until it was informed of the total amount at the end of the year by Terri Lynn Tondelli, an employee of Price Coal. On or about November 30 of the years 1979 through 1983, she computed the amount of funds that sublessees had borrowed from Coal Funding by adding the amounts on the recourse notes executed by the investors. She then prepared a note to be executed by Mr. Bird as president of Coal Funding, obligating it to pay Price Coal the same amount of money that the sublessees were obligated to pay Coal Funding. Mr. Bird executed five recourse promissory notes in which Price Coal is listed as payee as follows:

| Date of note | Amount of note |
|---|---|
| 11/30/79 | $1,704,375 |
| 11/30/80 | 1,222,650 |
| 11/30/81 | 1,816,800 |
| 11/30/82 | 2,365,800 |
| 11/30/83 | 2,156,700 |
| Total | 9,266,325 |

In 1979, 38 investors entered the Price Coal leasing program for 1979–80, including Mr. and Mrs. Reaume. Mr. Reaume listed his occupation on his Federal income tax returns for the years at issue as "corporation president," and Mrs. Reaume listed her occupation as "sales." In connection with their investment, they executed the following documents which are dated July 27, 1979: letter of intent, lease instructions, mining lease, and mining contract.

The lease instructions in the 1979–80 booklet contained the following schedule:

LISTED BELOW ARE THE TAX WRITEOFFS
FOR THE VARIOUS UNIT INVESTMENTS:

| Units | Cash invested (out of pocket) | Funds borrowed | Minimum tons of coal guaranteed | Writeoff |
|---|---|---|---|---|
| .50 | $6,875 | $20,625 | 150,000 | $27,500 |
| 1.00 | 13,750 | 41,250 | 300,000 | 55,000 |
| 1.50 | 20,625 | 61,875 | 450,000 | 82,500 |
| 3.00 | 41,250 | 123,650 | 900,000 | 165,000 |
| 5.00 | 68,750 | 206,250 | 1,500,000 | 275,000 |

A sample Schedule C showing the deduction was included in the 1979–80 promotional booklet. The Reaumes executed lease instructions indicating that they wished to invest in one unit (a sublease of lands warranted to contain 300,000 tons of coal).

In consideration for entering the program, a sublessee agreed to pay a deposit of $1,000 plus a royalty payment. Under the terms of the mining lease, the sublessee was entitled to mine all of the economically recoverable coal on the leased premises for a period of 5 calendar years plus the balance of 1979. The lease could also be extended if the sublessee was actively developing or mining the property on a continuous basis or it could be canceled if the sublessee concluded that the leased coal reserves were exhausted.

The mining lease in the 1979–80 program booklet provides in part as follows with respect to the payment of royalties:

6. *Royalties.* The Lessee shall pay as rental for said coal and mining rights and privileges hereby leased, a royalty of the greater of (1) 15% of the net pit price plus $1.00 per ton of 2,000 pounds of run-of-mine merchantable coal hereby leased or (2) $2.00 per net ton of run-of-mine merchantable coal hereby leased and which is sold from said premises; provided, however, that Lessee shall pay as rental for said mining rights and privileges hereby leased, a royalty of $1.50 per net ton of the initial 150,000 tons sold or mined, removed and marketed.

(a) *Advanced Minimum Royalties.* Lessee will be required to pay Lessor an advance minimum royalty of $55,000.00 per year. The minimum annual royalty payment herein provided for shall be recoupable at the rate of $1.50 per ton of coal sold or mined, removed or marketed. The minimum annual royalty for the first lease year is payable upon execution of the lease. The minimum annual royalty for each subsequent year for years 2-5 hereof shall be payable on the successive anniversary dates of the execution hereof.

All royalty payments made to Lessor will have a cumulative effect with reference to the requirement of paying the minimum annual royalty

payments. Therefore, any royalty paid by Lessee will be applied towards the annual minimum royalty payment required. Minimum royalties are non-refundable.

(b) In the event that the Lessee shall sell coal in place by way of a carved-out production payment or otherwise, Lessee will be obligated to pay Lessor a royalty payment to the same extent as if the coal had been mined, removed and marketed. Such royalties shall be due and payable within eighteen months of the date on which the contract creating the production payment is made.

(c) Lessee shall make payments, on or before the twentieth (20) day of the calendar month succeeding the month of production, for all coal sold from the Leased Premises and will furnish sworn monthly statements therewith showing in tons the amount of coal mined.

(d) Lessor warrants that the economically recoverable coal reserves contained within the Leased Premises are in excess of 300,000 net tons. In the event the economically recoverable coal reserves are subsequently determined to be less than 300,000 net tons, Lessor will provide Lessee with additional similar coal property in the same vicinity containing economically recoverable coal reserves equal to the difference between the economically recoverable coal reserves included in the Leased Premises and 300,000 net tons. The additional coal reserves will be subject to the same royalty provisions that pertain to the properties described in this lease. The determination to the effect that the properties described in this lease contain economically recoverable coal reserves of less than 300,000 net tons and the amount of the deficiency may be ascertained at any time by a licensed engineer or engineers recognized in the community in which the properties are located as competent to give an opinion concerning economically recoverable coal reserves. Said opinions shall be required to be made under oath.

The mining lease did not contain any provision defining how the royalties were to be paid or what constituted payment. The mining lease actually executed by the Reaumes required them to pay an advanced minimum royalty of only $45,000.

The mining contract executed by the Reaumes was with Price Ltd. It specified that the Reaumes possessed and controlled certain lands and coal leases on an undefined parcel of 760 acres in McLean County, North Dakota. The abstract of instrument, which purports to describe the lands subleased to the Reaumes in 1979, indicates that the parcel subleased is 33.88 net acres out of 192.5 gross acres. The evaluation of coal reserves with respect to the Reaumes prepared by Mr. Tillotson states that the parcel being evaluated is "200 net [acres] out of 600 gross" acres. The legal description contained therein is for a different parcel

of land than is described in the Reaumes' abstract of instrument.

Under the terms of the mining contract executed by the Reaumes, Price Ltd. agreed to "excavate, mine and remove one-fifth of all merchantable, strippable coal that can be practicably, economically and profitably strip-mined by contractor from the project area." Price Ltd. also agreed to commence mining beginning with the month of January 1980 and to mine at least an average of 1,000 net tons of coal per month until the contract expired on December 31, 1984. The mining contract also contained a penalty clause wherein Price Ltd. agreed to pay the Reaumes a penalty of $27.24 per day, computed on the basis of a 360-day year, for each day that it did not mine. Thus, if no coal was mined during the contract, the total penalty was $49,032, computed as follows: $27.24 (daily penalty rate) × 360 days × 5 years = $49,032.

On December 20, 1979, the Reaumes also executed a recourse promissory note requiring them to pay Coal Funding $33,750 (the remaining three-quarters of the royalty payment due in 1979) on or before December 31, 1984. The interest rate on the principal was 9-percent simple interest per year which was due and payable on the maturity date of the note. The total interest and principal due on this note on December 31, 1984, its maturity, was $48,937.50, computed as follows: $33,750.00 (principal) × 9% (interest) × 5 years = $15,187.50 (total interest) + $33,750.00 (principal) = $48,937.50. Thus, with respect to their participation in the 1979–80 program, the Reaumes would owe Coal Funding $48,937.50 as of December 31, 1984; but if no coal was mined, Price Ltd. would, as of that date, owe the Reaumes $49,032.00 under the penalty clause of the mining contract.

It was explained to prospective investors in the 1979–80 program that a sublessee's liability to Coal Funding would be offset by the liability of Price Ltd. to the sublessee. Investors were also told by Mr. Price that mining was not likely to commence within the 5-year period of the 1979–80 program; and, indeed, as of the date of trial, no mining had commenced with respect to any property subleased by Price Coal to any investor in any of the programs.

In 1980, the Reaumes purported to continue to pay advanced minimum royalties in accordance with the mining lease executed by them in 1979. The advanced minimum royalty of $45,000 due under the lease in 1980 was made by a recourse note in favor of Coal Funding in the amount of $33,750 and a cash payment of $11,250. The Reaumes paid the entire $45,000 advanced minimum royalty due in 1981, 1982, and 1983 under the terms of their lease by nonrecourse notes in favor of Price Coal. These three nonrecourse notes bore 9-percent interest and were all due on December 31, 1984.

In July 1980, Mr. Reaume executed instructions indicating his desire to purchase an additional one-half unit in the 1979–80 program. The royalty due in 1980 for his sublease of land warranted to contain 150,000 tons of coal was $27,500; he paid one-quarter, or $6,875, in cash, and the remainder, $20,625, was borrowed from Coal Funding by a recourse promissory note. In connection with this additional investment, Mr. Reaume executed a mining lease, a mining contract, and other documents that were substantially identical to those executed by the Reaumes in connection with their 1979 investment.

In 1981 and 1982, Mr. Reaume paid the advanced minimum royalty required by the 1980 mining lease by a cash payment of $6,875 and a recourse note in favor of Coal Funding in the amount of $20,625 due December 31, 1985, bearing 9-percent simple interest. For the year 1983, he paid the entire advance minimum royalty by a nonrecourse note payable to Price Coal bearing 9-percent interest and due December 31, 1985.

In 1980,[4] Mr. and Mrs. Croci entered the 1979–80 program, investing in one-half unit (150,000 tons of coal) requiring an advanced minimum royalty of $27,500 and a cash payment of $6,875. Mr. and Mrs. Croci were retired during their taxable year at issue. In connection with this investment, the Crocis executed the following documents all bearing the date November 30, 1980: lease instructions, mining lease, abstract of instrument, loan agreement for

---

[4]The Crocis began to participate in the Price Coal leasing program in 1978. However, their 1978, 1979, and 1980 taxable years are not before us, and in 1981, they claimed no deduction by reason of their participation in the program commenced in 1978. Consequently, we are not concerned with the circumstances surrounding their participation in that program.

$137,500, recourse promissory note for $20,625, authorization to negotiate, and mining contract.

The mining contract executed by Mr. and Mrs. Croci in 1980 was for a 5-year period from January 1981 until December 31, 1985. This contract contained a penalty clause, wherein Price Ltd. agreed to pay the Crocis a penalty of $16.62 per day, computed on the basis of a 360-day year, for each day that it did not mine. Thus, if no coal was mined under the contract, the total penalty due was $29,916, computed as follows: $16.62 × 360 (days) × 5 (years) = $29,916.

The recourse promissory note executed by the Crocis in 1980 required them to pay Coal Funding $20,625 (the remaining three-quarters of the 1980 advanced minimum royalty) with simple interest at the rate of 9 percent per year. The interest and principal were due and payable on December 31, 1985. Thus, the total interest and principal was $29,906.25, computed as follows: $20,625.00 (principal) × 9 percent (interest) × 5 (years) = $9,281.25 + $20,625.00 (principal) = $29,906.25.

In 1981, 1982, and 1983, the Crocis paid the advanced minimum royalties due under the 1980 lease by a cash payment of $6,875 and a recourse note in favor of Coal Funding in the amount of $20,625. In each year, the Crocis also executed a mining contract. The contract for 1981 was for 4 years; the one for 1982, for 3 years; and the one for 1983, for 2 years. Each contract required Price Ltd. to mine one-fifth of the total reserves leased and contained a daily penalty provision that was to be applied when mining did not take place. The per-day penalties provided in the contracts were: for 1981, $19.48; for 1982, $24.25; and for 1983, $33.80. Each note payable to Coal Funding required the payment of 9-percent simple interest per year and specified that the principal and interest were due at maturity, December 31, 1985. Thus, for such years, the Crocis' liability to Coal Funding under the notes was offset by the liability of Price Ltd. to them, as is shown by the following charts:

Amounts Due Under Notes

| Year | Loan amount | Interest rate | Total interest | Total principal and interest |
|------|------------|---------------|----------------|------------------------------|
| 1981 | $20,625 | 9% | $7,425.00 | $28,050.00 |
| 1982 | 20,625 | 9% | 5,568.75 | 26,193.75 |
| 1983 | 20,625 | 9% | 3,712.50 | 24,337.50 |
| | 61,875 | | 16,706.25 | 78,581.25 |

Penalty Computation

| Year contract made | Daily penalty amount | Term of contract | Total penalties |
|--------------------|----------------------|------------------|-----------------|
| 1981 | $19.48 | 4 years | $28,051.20 |
| 1982 | 24.25 | 3 years | 26,190.00 |
| 1983 | 33.80 | 2 years | 24,336.00 |
| | | | 78,577.20 |

In 1980, Mr. Spiller entered the 1979–80 program by investing in one-half unit which required a cash payment of $6,875. Mr. Spiller was a crew leader employed by an electric utility during his taxable years at issue. In connection with his investment, he executed the following documents which all bear the date July 31, 1980, with the exception of the undated lease instructions: mining lease, abstract of instrument, loan agreement for $137,500, recourse promissory note for $16,875, authorization to negotiate, lease instructions, and mining contract.

The mining contract executed by Mr. Spiller in 1980 was for a 5-year period from January 1981 until December 31, 1985. It contained a penalty clause, wherein Price Ltd. agreed to pay Mr. Spiller a penalty of $16.62 per day, computed on the basis of a 360-day year, for each day that it did not mine. Thus, if no coal was mined under the contract, the total penalty due was $29,916, computed as follows: $16.62 × 360 (days) × 5 (years) = $29,916.

The mining lease executed by Mr. Spiller in 1980 required him to pay an advanced minimum royalty of $27,500 for a half unit, and the lease instructions executed by him indicated that he was to execute a recourse note in favor of Coal Funding in the amount of $20,625. For 1980, he deducted an advanced minimum royalty of $27,500. However, the recourse promissory note actually executed by him in 1980 required him to pay Coal Funding only $16,875 with

simple interest at the rate of 9 percent per year. The interest and principal were due and payable on December 31, 1985. Thus, the total interest and principal was $24,468.75, computed as follows: $16,875.00 (principal) × 9 percent (interest) × 5 (years) = $7,593.75 + $16,875.00 = $24,468.75.

In 1981 and 1982, Mr. Spiller paid the advanced minimum royalty due under the terms of the lease by a cash payment of $6,875 and a recourse promissory note in favor of Coal Funding for $20,625. In 1983, Mr. Spiller paid the entire advanced minimum royalty due under this lease for that year by a nonrecourse note in favor of Price Coal.

Mr. Spiller also executed mining contracts in 1981 and 1982. The contract for 1981 was for 4 years, and the one for 1982 was for 3 years. These contracts, like the contract he executed in 1980, required that Price Ltd. mine one-fifth of the total reserves leased. Each contract also contained a daily penalty provision that was to be applied when mining did not take place. The daily penalty for 1981 was $19.48, and for 1982, it was $24.25. He did not execute a mining contract for 1983. Mr. Spiller's liabilities to Coal Funding under the recourse notes executed by him in 1981 and 1982 are offset by the liabilities of Price Ltd. to him, as is shown in the following charts:

Amounts Due Under Notes

| Year | Loan amount | Term of loan | Total interest | Total principal and interest |
|------|-------------|--------------|----------------|------------------------------|
| 1981 | $20,625 | 4 years | $7,425.00 | $28,050.00 |
| 1982 | 20,625 | 3 years | 5,568.75 | 24,337.50 |
| | 41,250 | | 13,093.75 | 52,387.50 |

Penalty Computation

| Year contract made | Daily penalty amount | Term of contract | Total penalties |
|--------------------|----------------------|------------------|-----------------|
| 1981 | $19.48 | 4 years | $28,051 |
| 1982 | 24.25 | 3 years | 26,190 |
| | | | 54,241 |

A multi-phase exploration program is essential to determine if coal can be successfully mined at a profit from a selected block of land. The investigations are phased in order to minimize cost and risk in evaluating undeveloped

coal lands. Progressive evaluations are made between each phase to provide greater degrees of certainty that the coal is present in sufficient quantities to warrant expenditure of additional funds. In the first phase of an exploration program, a preliminary investigation is made to determine if potential coal reserves are located on a property, which typically has been selected by a geologist attempting to target areas that are thought to contain minable quantities of coal. All the known information about the property is then assembled and evaluated. Such study includes an examination of known geologic data (available from Federal and State geologic surveys), the evaluation of previous mining activities in the area, and discussions with persons familiar with the area under consideration. Where it appears that coal mining conditions are favorable, selected drilling is initiated. The drilling program provides data necessary to determine coal height and quality. The object of this phase is to obtain an accurate three-dimensional map of the prospective surface mine reflecting seam depth, thickness, continuity, coal quality and quantity, and the nature of the overburden, as well as potential surface and underground problems.

The feasibility analysis that comprises the second phase includes an analysis of market needs and location, transportation availability and cost, and product quality and quantity versus consumer specifications and demand. An estimate of the tons of recoverable coal is made and the annual optimum coal production rate is determined. Inherent in this stage of the process is the evaluation of the barriers and costs involved in environmental permitting and compliance. An economic feasibility study will determine the profitability of the operation and will include such detailed items as the production rate, production schedule, capital, development and operating costs, and the expected coal sales prices. If the results of the second phase of the exploration program are favorable, a detailed mine design and reclamation plan is developed as the final step.

There are chemical and physical properties of lignite that constrain its market potential. Lignite has a higher moisture content and lower heating value than bituminous coal; hence, larger quantities of lignite must be shipped in order

to provide an equivalent amount of delivered energy. About 400 miles is the upper limit on shipping lignite by rail, and about 300 miles when transporting by truck. The most significant transportation problems are due to characteristic properties of lignite such as high moisture content, spontaneous combustion, fugitive dust emissions, and freezing.

Nearly all of North Dakota lignite production is consumed by electric power plants under long-term contracts. About 80 percent of all coal mined in North Dakota is consumed by mine-mouth or captively held electric generating plants.

Mr. Price hired Clarence D. Johnson, a mining engineer, to prepare a market survey 6 years after the program was initiated. Mr. Johnson's four-page report, which was prepared only 2 weeks prior to trial, gives no indication that there were any viable markets for the Price Coal program coal.

In selecting properties to surface mine, it is important to assemble large tracts of land, so that when mining is undertaken, the miner will be able to mine a large continuous block of coal. The size of the tract available for mining can have substantial impact on the overall cost of mining. For example, substantial economies of scale can be realized in a large surface mining operation that utilizes a dragline to remove the overburden and coal. This type of operation results in a much lower cost per ton of mined coal than a more conventional mining method, like the use of a dozer and scraper, which would be used on only small tracts of land.

As of the date of trial, Price Coal had leased approximately 10,040 acres of land located in Dunn, McLean, Mountrail, and Williams Counties, North Dakota, which it obtained from Great American. Price Coal obtained a lease of these lands from Great American without initiating any coal exploration program to determine if coal could be successfully mined at a profit from any given property. The approximate acreage in each county is as follows:

| | |
|---|---|
| Dunn County | 2,600 acres |
| McLean County | 1,080 acres |
| Mountrail County | 4,520 acres |
| Williams County | 1,840 acres |

The lease holdings are found in four distinct areas, and within a given area, the individual tracts of land that it has leased are scattered. The distance between these areas varies from 30 to as much as 70 miles. In all four areas, few leases are contiguous. Every tract of land subleased by Price Coal to an investor was selected by the First Bank of North Dakota, Minot, North Dakota, from properties made available by Great American. Price Ltd. effectively had no control over the selection of an individual tract of land that was assigned to any sublessee. The cost to surface mine a particular piece of property depends, not only upon the stripping ratio (the number of cubic yards of overburden removed per ton of coal extracted), but also upon the configuration of the property. Nevertheless, Price Ltd. agreed to mine the coal for each investor in the 1979–80 and subsequent programs at a fixed cost of $8 per ton over the entire 5-year life (plus extensions) of the mining contract. The mining contract contained no escalation clause.

Lignite coal mining in North Dakota is a highly regulated industry. The mine application and permitting process for each proposed mine and compliance with the regulations while mining are complex, time consuming, and expensive. In about November 1977, Mr. Price wrote to the Public Service Commission of North Dakota (the commission) requesting information and materials needed for a permit application to surface mine coal in the State. By letter dated November 3, 1977, the commission sent Mr. Price copies of the following: (1) The North Dakota Reclamation Law and Rules and Regulations; (2) Permit Guidelines; and (3) Permit Application Form M-1.

On April 12, 1978, the commission received from Price Coal the two-page Form M-1 captioned "Application for Permit to Engage in Surface Mining in the State of North Dakota," dated March 12, 1978. The application was stated to cover 240.4 acres in Williams County. Mr. Price did not submit the bond required to be filed with the application or the other application materials required by State law. By letter dated April 24, 1978, the commission informed Mr. Price that the permit application would not be "considered

until the Commission receives a completed permit application."

In 1983, after the issuance of the notice of deficiency to Mr. and Mrs. Capek, Mr. Price hired LETEC Corp., a company which specializes in obtaining mining permits, to apply for a surface mining permit for Price Ltd. The Shell Creek area covered by the permit application dated October 1983 consists of 297.5 acres in Mountrail County. This property was leased by Great American from John and Marie McNamara on July 27, 1983. This lease was thereafter assigned to Price Coal by written assignment dated July 29, 1983. On October 18, 1983, Price Coal assigned the same coal lease to Price Ltd. The application was reviewed by the commission, and on February 7, 1984, it issued a deficiency statement which listed minor deficiencies.

No rights in the Shell Creek property have been given to the petitioners or to any of the other sublessees in the Price Coal program. The estimated coal production of the Shell Creek property covered by the application is 1.4 million tons over a projected 14-year life. As of the date of trial, neither Price Coal nor Price Ltd. had received a mining permit as to any acreage, and accordingly, no coal has ever been mined under the various Price Coal leasing programs.

The U.S. Corporation Income Tax Returns for Price Ltd. for the fiscal years ended November 30, 1980, through November 30, 1983, disclose a constant net worth of $1,000. The only business activity on these returns is gross sales of $330 in its fiscal year ended November 30, 1982, which income was exactly offset by a deduction in the same amount for professional fees. During the period for which these returns were filed, Price Ltd. signed numerous mining contracts with the Price Coal program's sublessees agreeing to mine coal at a flat rate of $8 per ton, without regard to where the sublessees' property was located or whether it contained any minable coal. Mr. Price, on behalf of Price Ltd., executed numerous mining contracts in which he promised each sublessee that he would commence mining in January following the year the contract was executed when he knew that mining could not commence as promised.

The major marketing advantage characteristic of North Dakota lignite producers is low cost coal, which is a

function of mine productivity. The mine price for North Dakota lignite is variable. On the low side, it ranges from about $7 per ton for as-mined coal sold to a utility on a high-volume, long-term contract. On the average, the price of utility coal is about $11 to $12 per ton. On the high side, coal sold for domestic heating on a spot market or short-term contract basis may bring approximately $18 per ton. It has been estimated that the mine price for coal planned to come from the Shell Creek mine is $20 per ton. Thus, according to the estimated cost of production from the Shell Creek mine, such production exceeds the highest sales price of lignite for any market, rendering the mine uneconomic.

The petitioners deducted the following amounts as coal mining royalties during their taxable years in issue:

| Petitioners | Taxable year | Amount deducted |
|---|---|---|
| Capeks | 1978 | $45,000 |
| Reaumes | 1979 | 45,000 |
| | 1980 | 72,500 |
| Crocis | 1981 | 27,500 |
| Spillers | 1980 | 27,500 |
| | 1981 | 27,500 |

In the notices of deficiency, the Commissioner disallowed the claimed royalty deductions in full.

## OPINION

These consolidated cases are serving as test cases for the other investors in the Price Coal programs whose cases before this Court are being held in abeyance pending our decision herein.[5] These test cases were chosen as being representative of the various tax years and issues involved. In order to obtain a resolution of all the issues, the Commissioner states on brief that the parties have agreed that specific issues presented only apply to particular taxpayers. Thus, the Commissioner presents the profit motive and the minimum royalty issues as applying only to the petitioners Capek and Reaume, while the "at risk" issues under section 465 are presented as applicable only

---

[5]There were a total of 192 investors in the Price Coal programs during the years 1977–83. It is not clear from the record how many of these investors have cases pending before this Court.

to petitioners Croci and Spiller. However, our discussion of the various issues will, where appropriate, encompass a discussion of the particular issue's application to all the taxpayers involved. Because of the status of these cases as test cases, we will address all the issues presented in order to avoid further litigation.

The petitioners in these cases are all individuals who invested directly in the Price Coal programs for their particular tax years involved. They have no relationships with each other except that they separately entered agreements with corporations controlled by Rodman G. Price, the promoter. The common issue is whether the various taxpayers are entitled to claim losses on their Federal income tax returns attributable to advanced royalty deductions.

To fully deduct their advanced royalty payments, the taxpayers must first establish that such payments were expenses incurred either in a trade or business or in an activity for which deductions are allowable under paragraphs (1) and (2) of section 212. Otherwise, under section 183(b)(2) these deductions are allowable only to the extent gross income derived from the activity exceeds the deductions allowable without regard to whether or not such activity was engaged in for profit, i.e., interest and taxes.

It is well settled that to constitute the carrying on of a trade or business, the activity must be engaged in with an "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); *Fuchs v. Commissioner*, 83 T.C. 79, 97–98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 73–74 (1984); *Allen v. Commissioner*, 72 T.C. 28, 33 (1979). A profit objective is also necessary in order to deduct expenses under section 212(1) or (2). *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981); *Jasionowski v. Commissioner*, 66 T.C. 312, 320 (1976). Although a reasonable expectation of profit is not required, the taxpayer must have the intent and objective of realizing a profit. *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Brannen v. Commissioner*, 78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984). "Profit" in this context means economic profit, independent of tax savings. *Beck v. Com-*

*missioner*, 85 T.C. 557 (1985); *Herrick v. Commissioner*, 85 T.C. 237, 254 (1985); *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983).

The issue of whether a taxpayer possesses the requisite profit motive is one of fact to be resolved on the basis of all the evidence in the case. *Sutton v. Commissioner*, 84 T.C. 210, 221 (1985); *Fox v. Commissioner*, 80 T.C. 972, 1007 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5–7, 9 (3d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984); *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. *Thomas v. Commissioner*, 84 T.C. 1244, 1269 (1985); *Engdahl v. Commissioner*, 72 T.C. 659 (1979). The petitioners bear the burden of proving that they possessed the required profit objective. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933); *Dreicer v. Commissioner*, 78 T.C. at 644–645; *Golanty v. Commissioner*, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Moreover, because no partnership is involved, the intent of each petitioner is determinative.

Section 1.183–2(b), Income Tax Regs., sets forth a nonexclusive list of some relevant factors to be considered in determining whether an activity is engaged in for profit; they are: (1) The manner in which the taxpayers carry on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. *Allen v. Commissioner*, 72 T.C. at 33. A record of losses over the years and the unlikelihood of

achieving a profitable operation are important factors bearing on the taxpayer's true intention. Sec. 1.183–2(b)(6), Income Tax Regs.

Based on all the evidence in the record before us, we find that none of the petitioners invested in the Price Coal programs with an actual and honest objective of making a profit. Rather, we are convinced that the petitioners entered into the Price Coal transactions primarily, if not exclusively, to obtain the promised tax deductions and thereby shelter from tax their income from other sources. See *Beck v. Commissioner*, 85 T.C. at 573.

The Price Coal offering booklets, which outline the structure of the program, stress that the investor will report a "deductible royalty payment of $4.00 for every $1 of personal investment funds." Conspicuous by its absence is any estimate or projection of profit that investors might expect to realize. The transactional documents are preprinted and form a major portion of the offering booklet. The investors did not negotiate any of the terms of their investment with Price Coal, but rather accepted the package as a whole.[6]

Mr. Capek, Mr. Spiller, Mr. Reaume, and Mrs. Croci testified at trial concerning their investments in the Price Coal programs. While they all paid lip service to the potential for profit from the sale of coal at some point in the future, it was clear that none of them had any prior experience in coal mining or conducted an investigation commensurate with the size of their investments.[7] In fact, Mrs. Croci admitted on cross-examination that she did not even understand how the program operated. The petitioners learned of the program through their tax preparers or financial advisors and were able, through these investments, to shelter from taxation substantial amounts of income that they received from other sources. None of the petitioners contacted their attorneys regarding the program. Mr. Capek

---

[6]On brief, the petitioners maintain that the investors were not required to borrow the royalty payment from Price Ltd. or Coal Funding or contract to sell the subleased coal to Price Ltd. but, rather, were free to make alternative arrangements. However, it is clear from the record that the program was presented to prospective investors as a package and that those who chose to invest were expected to and did participate in all the interlocking steps.

[7]The petitioners argue on brief that their testimony as to their profit motive satisfies their burden of proof on this issue. They conclude that since the Commissioner did not refute this testimony that they have proved their bona fide profit motive. We do not agree. This Court

did not conduct any personal investigation, but rather relied solely on his tax preparer. Mr. Spiller's investigation consisted of reading in the library newspaper articles on the need for coal and talking to other investors. Mr. Reaume relied on his discussions with his accountant and his own analysis of the program booklet.

In resolving the profit motive issue, it is also important to examine the manner in which the business is conducted. *Flowers v. Commissioner*, 80 T.C. 914, 932 (1983); *Siegel v. Commissioner*, 78 T.C. at 700–702; *Brannen v. Commissioner*, 78 T.C. at 509–511. In *Surloff v. Commissioner*, *supra*, we discussed a number of factors important in establishing a mining operation as follows:

> Opening up a coal mine or even a strip mining operation requires a large amount of capital * * * . Operating a coal mine profitably requires not only minable seams of coal but also miners and machinery to mine and remove the coal from the mine or the face, water and electricity, access roads to and from the entries, tipples and cleaning plants that are nearby and are capable of handling the coal, good roads or railroads from the tipple or cleaning plant to the point of distribution, and customers who will buy the coal at a price that will yield a profit. It must also be recognized that there may be strikes, mine closings because of weather, safety hazards, or other reasons, and that there may be variations in the costs of mining and transporting the coal, and the selling price of coal. * * * [81 T.C. at 234–235.]

It clear from the record that no serious consideration was ever given to any of these factors. The booklets describe only how the documents are intended to work, not how coal is to be mined. Investors are provided no information regarding the experience of Rodman G. Price or Price Ltd., the entity which is supposed to conduct the actual mining. None of the "mining contracts" or "mining leases" introduced into evidence describe the property to be mined. To the extent the property is described in the "abstracts of instrument," the legal descriptions are often inconsistent and contradictory as to the location and numbers of acres involved. Moreover, Price Ltd. agreed to mine these various tracts without any knowledge as to whether they could be

---

need not accept testimony, even if uncontroverted, as fact. *Hradesky v. Commissioner*, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). Rather, much greater weight is to be accorded objective facts than self-serving statements as to intent. *Surloff v. Commissioner*, 81 T.C. 210, 239 (1983); *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982).

economically mined, whether they contained the many millions of tons it promised to mine, or whether there were any markets to absorb the tonnage mined. The leased properties were selected by a bank, not by Price Ltd., the prospective mining company, and the properties were not located contiguously so that they could be most economically mined. No consideration was given to how the coal could be sold or as to how the vast amounts of capital that would be needed to mine the coal could be secured.

It is also significant that these leasing programs were put into operation despite the fact that none of the individuals or entities involved had received a mining permit from the State of North Dakota. No serious attempt was made to secure the necessary mining permits until the Internal Revenue Service issued its notice of deficiency. Moreover, the belated attempt was an application covering 297.5 acres which was estimated to produce only 1.4 million tons of coal over a 14-year period. Despite the lack of a mining permit and the total failure to secure and arrange for the production of coal, Price Ltd. entered into contracts to begin mining shortly after the investments were made. No coal has been mined, and there were no precise plans for the mining of coal. The fact that the petitioners herein invested in the program, which ostensibly obligated them to pay large annual royalties for coal that could not be mined, leads us to conclude that the mining of coal was, at best, incidental to achieving their true objective for investing in the Price Coal program—that is, the promised $4 tax deduction for every $1 invested.

The next issue for our decision is whether the petitioners' claimed royalty deductions[8] meet the requirements of section 1.612–3(b)(3), Income Tax Regs., which provides in pertinent part as follows:

(3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered

---

[8]Although our conclusion on the profit motive issue necessarily precludes petitioners Capek and Reaume from deducting any business expenses (see *Ramsay v. Commissioner*, 83 T.C. 793, 822 (1984), we also address the advanced minimum royalty issue in order to prevent further litigation by other investors in the Price Coal programs.

to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. *For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount.* For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended shall be treated as part of the term of the original lease. * * * [Emphasis added.]

The validity of this regulation has been repeatedly upheld. *Oneal v. Commissioner*, 84 T.C. 1235 (1985); *Wing v. Commissioner*, 81 T.C. 17 (1983); *Wendland v. Commissioner*, 79 T.C. 355 (1982), affd. per curiam 739 F.2d 580 (11th Cir. 1984), affd. sub nom. *Redhouse v. Commissioner*, 728 F.2d 1249 (9th Cir. 1984).[9] The petitioners do not seek to renew this argument.

Section 1.612–3(b)(3) of the regulations provides the general rule that deductions for royalties are postponed until the mineral product is produced and sold. An exception is provided where the royalties are paid or accrued pursuant to a minimum royalty provision. Where such a minimum royalty provision exists, a taxpayer may, at his option, deduct the royalties in the year in which they are paid or accrued. The operative definition of the term "minimum royalty provision" is the requirement that a substantially uniform amount of royalties be paid at least annually over the term of the lease or for a period of at least 20 years. Inherent in such definition is that there must exist an enforceable requirement that payment be made. *Wing v. Commissioner*, 81 T.C. at 38 n. 30.

It is undisputed that no coal was mined by the petitioners during their taxable years at issue or as of the date of

---

[9]Sec. 1.612–3(b)(3), Income Tax Regs., was amended in December 1977 retroactive to Oct. 29, 1976. T.D. 7523, 1978–1 C.B. 192. Prior to its amendment, a payor of advanced royalties was given the option of either (1) deducting them from gross income for the year in which they were paid or accrued or (2) deducting them from gross income for the year in which the mineral product, in respect of which the advanced royalties were paid, was sold. See *Seaman v. Commissioner*, 84 T.C. 564, 584–586 (1985).

trial. Therefore, the petitioners do not contend that their royalty deductions are allowable as advanced royalties relating to the production of coal. Rather, they argue that the mining leases entered into by the petitioners contain a minimum royalty provision that meets the requirements of section 1.612–3(b)(3), Income Tax Regs.

The program that Mr. Price promoted in 1977 and 1978 used nonrecourse financing, and the program that he promoted in 1979 and thereafter used alleged recourse financing. However, both programs emphasized the "4 to 1" "tax writeoffs" and depended on deductions for advanced minimum royalties in amounts 4 times greater than the cash contributed by the investors in order to deliver the promised tax benefits.

In their mining leases, the petitioners obligated themselves to pay Price Coal amounts ranging from $22,500 to $45,000 annually for 5 years. The specific provision states as follows:

*Advanced Minimum Royalties.* Lessee will be required to pay Lessor an advanced minimum royalty of _____ per year. The minimum annual royalty payment herein provided for shall be recoupable at the rate of $1.50 per ton of coal sold or mined, removed or marketed. The minimum annual royalty for the first lease year is payable upon execution of the lease. The minimum annual royalty for each subsequent year for years 2-5 hereof shall be payable on the successive anniversary dates of the execution hereof. * * *

The language of the advanced minimum royalty paragraph was identical for all the participants, except for the varying dollar amounts. Another section of the leases provides that, in addition to all other remedies, the lessor could foreclose on the lease if the royalties were not paid.

The petitioners contend that, based on the mining leases they executed, they were obligated to pay the following royalties:

| Petitioners | Annual royalty | Period | Total amount |
|---|---|---|---|
| Capek | $45,000 | 1979–82 | $225,000 |
| Reaume | | | |
| 1979 lease | 45,000 | 1979–83 | 225,000 |
| 1980 lease | 27,500 | 1980–84 | 137,500 |
| Croci | | | |
| 1980 lease | 27,500 | 1980–84 | 137,500 |
| Spiller | 27,500 | 1980–84 | 137,500 |

The petitioners argue that because the relevant section of the mining leases provides that the lessee is required to pay an advanced minimum royalty for 5 years (the term of the lease)[10] the provision meets the requirement of the regulations. The Commissioner contends that even if the transactional documents purport to require the taxpayers to pay a "substantially uniform amount of royalties * * * over the life of the lease," the facts demonstrate that in practice there was no such requirement.

The record shows that none of the petitioners actually paid these amounts in cash. The most that any of the investors paid was one-fourth of the required royalty, and they paid such amounts in only some years; in other years, they paid nothing. Their investments were as follows: Mr. Capek paid only once—one-fourth, or $11,250, in 1978. The Reaumes paid twice on their 1979 lease—$11,250 in 1979 and 1980; they paid no money in 1981, 1982, or 1983. Mr. Reaume paid 3 times on his 1980 lease—$6,875 in 1980, 1981, and 1982; he paid nothing in 1983. The Crocis paid 4 times on their 1980 lease—$6,875 in 1980 through 1983. Mr. Spiller paid 3 times on his 1980 lease—$6,875 in 1980, 1981, and 1982; he paid nothing in 1983.

In addition to these cash payments, the petitioners signed promissory notes for the remaining three-fourths of the royalty payments. In the 1978 program, the notes were specifically nonrecourse and were payable to Price Ltd. In the later programs, these notes were stated to be recourse in nature and were payable to Coal Funding. The investors also had the option of paying no cash at all in certain years by giving a nonrecourse note for the full royalty amount. This option was chosen by Mr. Capek in 1982 with a nonrecourse note for $45,000; by the Reaumes, for their 1979 lease in 1981, 1982, and 1983 with nonrecourse notes for $45,000; by the Reaumes, for their 1980 lease, in 1983 with a nonrecourse note for $27,500; and by Mr. Spiller, in 1983 with a nonrecourse note for $27,500.

---

[10]The Commissioner has not taken the position that the term of the leases exceeded 5 years. However, the leases provide for periods of extensions and the regulations state that such extension periods are to be included as part of the term of the original lease. Sec. 1.612–3(b)(3), Income Tax Regs.; see *Wing v. Commissioner*, 81 T.C. 17, 29 n. 32 (1983). Since the Commissioner has not raised the issue concerning the term of the leases, we do not comment on it.

A final course of action taken by certain of the petitioners was to drop out of the program entirely for certain years and make neither a cash payment nor execute a note. Thus, Mr. Capek signed nothing and paid nothing in 1979, 1980, and 1981. Price Ltd., Price Coal, and Coal Funding took no steps at any time to require any of the petitioners to pay the royalties ostensibly required by the terms of their leases.[11] See *Gauntt v. Commissioner*, 82 T.C. 96 (1984), revd. and remanded on another issue sub nom. *Heinz v. Commissioner*, 770 F.2d 874 (9th Cir. 1985).

With regard to Mr. Capek's participation in the 1978 program, the mining lease states that he is to make five consecutive annual royalty payments of $45,000, but the words "pay" and "payable" are nowhere defined. The record shows that he made this payment in 1978 with a check for $11,250 and a nonrecourse note for the remainder. Mr. Capek also signed a document captioned "Addendum to Mining Lease," which by its terms permits him to make the royalty payments due the third year of the lease and thereafter solely with nonrecourse notes for $45,000.

This Court has addressed the question of whether a nonrecourse note constitutes payment for purposes of the minimum royalty provision of section 1.612–3(b)(3) of the regulations on several occasions. In holding that a nonrecourse note does not constitute payment for such purposes, we stated:

To qualify for the deduction, the petitioner must meet the terms of the regulation, which sets out that a minimum royalty provision must *require* payment at least annually. That the note may in fact be paid at some later date is not sufficient to establish the existence of such a requirement. [*Wing v. Commissioner*, 81 T.C. at 40-41; emphasis in original; fn. ref. omitted.]

See also *Oneal v. Commissioner, supra*; *Vastola v. Commissioner*, 84 T.C. 969 (1985); *Maddrix v. Commissioner*, 83

---

[11]The petitioners, generally, included the full amount of the royalties in the losses claimed by them on their Federal income tax returns. However, the Reaumes limited their deductions in 1981 and 1982 to $27,500 (the 1980 lease royalty) because they had paid the full royalty on the 1979 lease with nonrecourse notes and therefore were not at risk with respect to those royalties under the 1979 lease. The petitioners' 1983 Federal income tax returns are not a part of the record, so there is no evidence as to whether the Reaumes or Mr. Spiller claimed losses for 1983 with regard to the nonrecourse notes signed by them in that year.

T.C. 613, 620–626 (1984), on appeal (11th Cir., March 12, 1985).[12]

The petitioners seek to distinguish *Wing* on the basis that, in such case, all royalties payable over the life of the lease were paid and deducted in the first year; whereas in the case before us, the program requires annual notes and payments. They also argue that with regard to the 1978 lease, there was no contingency regarding the sale of coal because Mr. Capek signed a contract for its sale. Finally, the petitioners argue that the nonrecourse financing used satisfies the regulation because the leases do not terminate before the due dates of the notes and because the taxpayers will pay the notes because the leases have increased in value.

We agree with the Commissioner that the petitioners' emphasis on the lump-sum royalty deduction in *Wing* is misplaced. In fact, we specifically noted in that case that we were not making any statement regarding the deductibility of lump-sum advance minimum royalties. *Wing v. Commissioner*, 81 T.C. at 42 n. 36. In *Maddrix v. Commissioner*, 83 T.C. at 620, we again declined to address the issue. In both of these cases, we held that the contingent nature of the notes failed to establish an enforceable requirement that substantially uniform minimum royalties would be paid annually. *Maddrix v. Commissioner, supra* at 623.

More importantly, in *Oneal v. Commissioner, supra*, a case decided subsequent to the filing of the parties' briefs herein, we were presented with facts comparable to those before us. In fact, although the promoter in that case was Wyoming and Western Coal Reserves, Inc., the program and the transactional documents are strikingly similar to the Price Coal programs. See also *Ward v. Commissioner*, T.C. Memo. 1984–570, on appeal (9th Cir., Jan. 14, 1985); *Thompson v. Commissioner*, T. C. Memo. 1984–337; *Walls v. Commissioner*, T.C. Memo. 1983–504.

In *Oneal*, as in the cases before us, the taxpayers were required to pay annual, rather than lump-sum, royalties.

[12]*Cohen V. Commissioner*, T.C. Memo. 1985–591; *Kaji v. Commissioner*, T.C. Memo 1985–341; *King v. Commissioner*, T.C. Memo 1985–340; *Ward v. Commissioner*, T.C. Memo. 1984–570, on appeal (9th Cir., Jan. 14, 1985); *Thompson v. Commissioner*, T.C. Memo. 1984–337; *Walls v. Commissioner*, T.C. Memo. 1983–504.

These annual royalties were to be satisfied by the payment of one-quarter of the amount in cash and the remaining three-quarters by execution of a nonrecourse promissory note. We reaffirmed our holdings in *Wing*, *Maddrix*, and *Vastola* as squarely on point and stated that:

Irrespective of the likelihood of the eventual satisfaction of such notes, the "addendum to mining lease" permitted deferral of the minimum annual royalties provided for in the "mining lease" so that payment was not required to be made at least annually. Consequently, the "payments" made by petitioners * * * were not made pursuant to a valid "minimum royalty provision" in accordance with valid section 1.612–3(b)(3), Income Tax Regs. [84 T.C. at 1241.]

The petitioners also argue that Mr. Capek's contract to sell coal to Price Ltd. renders the payment of his nonrecourse note definite. However, payment for the coal is not required until December 31, 1988, and the buyer, in its sole discretion, can extend the due date for an additional 10 years. Because the purported term of Mr. Capek's lease is only 5 years (with possible extensions), the date for payment of the coal extends far beyond the duration of the lease.

Finally, the petitioners' argument that the nonrecourse notes will be paid because the coal has increased in value is also meritless. Even if the petitioners had introduced evidence to prove their assertion, we have repeatedly held that the fact that the securing property might have sufficient value to assure the ultimate payment of nonrecourse promissory notes is irrelevant to the applicability of section 1.612–3(b)(3), Income Tax Regs., because the "regulation demands that the provision *require* a substantially uniform amount be paid at least annually." (Emphasis in original.) Eventual payment does not satisfy such a requirement. *Wing v. Commissioner*, 81 T.C. at 41; see also *Vastola v. Commissioner, supra*; *Maddrix v. Commissioner*, 83 T.C. at 623.

The 1979 and subsequent Price Coal leasing programs were changed primarily to satisfy the at-risk requirements of section 465. As a result, the investors in those programs executed recourse notes in favor of Coal Funding for the portion of their royalty payments not paid in cash. However, we agree with the Commissioner that such change is

cosmetic only and does not satisfy the requirement of section 1.612–3(b)(3), Income Tax Regs. Whether the petitioners signed recourse or nonrecourse notes is irrelevant. Even assuming that the petitioners would eventually pay the notes, payment after the close of the taxable year does not satisfy the requirement of the regulation that the royalties "be paid at least annually" over the term of the lease.

Moreover, even if we were to assume that the documents structuring the Price Coal program were sufficient to satisfy the regulation, the petitioners' conduct in withdrawing from the program at will belies any actual requirement to make annual royalty payments. The law is clear that courts may look behind a paper facade to find the actual substance and economic realities of the transactions. See e.g., *Knetsch v. United States*, 364 U.S. 361, 369 (1960); *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Forseth v. Commissioner*, 85 T.C. 127 (1985); *Houchins v. Commissioner*, 79 T.C. 570, 589–590 (1982). A review of the evidence shows that, in reality, there was no enforceable obligation on the investors to pay advanced minimum royalties.

The final issue for our decision is whether the losses claimed by Mr. Spiller in 1980 and 1981 and Mr. and Mrs. Croci in 1981 are limited by the at-risk rules of section 465. Section 465 was added to the Code by the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1531, and was intended to limit the amount of loss adjustments from certain activities to the amount of actual economic risk incurred by the taxpayer in connection with such activities. See *Elliston v. Commissioner*, 82 T.C. 747, 753 (1984) (Court reviewed), affd. without published opinion 765 F.2d 1119 (5th Cir. 1985); *Brand v. Commissioner*, 81 T.C. 821, 828 (1983).

In general, section 465 limits a taxpayer's loss to the amount that he has at risk and could actually lose from an activity. Certain activities that constitute a trade or business or that are engaged in for the production of income are subject to the at-risk rules.[13] Individuals are specifically

---

[13]Although we have determined that none of the petitioners before us invested in the Price Coal programs with the requisite profit motive, we assume, for purposes of the discussion of this issue, that petitioners Croci and Spiller were, in fact, engaged in a trade or business. We also assume that sec. 1.612–3(b)(3), Income Tax Regs., does not apply.

listed as taxpayers whose deductions are limited under this section. Sec. 465(a)(1)(A).

As relevant here, section 465(b) provides that a taxpayer shall be considered at risk for the amount of money contributed by him to the activity and for amounts borrowed to the extent that he is personally liable for the repayment of such amounts. Sec. 465(b)(1) and (2). The statute specifically excludes from amounts considered at risk amounts borrowed from certain interested or related persons (sec. 465(b)(3)(A)) and "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements" (sec. 465(b)(4)). The limitations of section 465 apply on the basis of the facts existing at the end of each taxable year. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86; see *Pritchett v. Commissioner*, 85 T.C. 580, 589 (1985) (Court reviewed).

The petitioners argue that they were at risk with respect to the losses in that they contributed their own funds and borrowed money from Coal Funding which they were personally obligated to repay. Thus, they contend that they meet the requirements of section 465(b)(1)(A) and (B). They further argue that none of the amounts used to satisfy the advanced royalty provisions of their mining leases was protected against loss within the meaning of section 465(b)(4). To the contrary, the Commissioner maintains that there were no "amounts borrowed" within the meaning of section 465(b)(1) and (2) and further argues that the petitioners were parties to "stop loss agreements, or other similar arrangements." Sec. 465(b)(4).

Our review of the Price Coal programs leaves us unconvinced that any amounts were ever borrowed under the arrangement with Coal Funding. The most significant evidence is that no money actually changed hands. Although the plan contemplated that Coal Funding would lend the investors the advanced royalties to be paid by them and that Mr. Price was authorized to negotiate the checks issued by Coal Funding, no checks were actually issued. The stated procedure was not followed; instead, Mr. Price's secretary merely totaled the investors' loans each year and instructed Coal Funding to "pay" their aggregate coal

royalties with its own note payable to Price Coal. The end result was that no funds changed hands.

Coal Funding was formed by three friends and associates of Mr. Price. It is very significant that, although Coal funding purported to loan more than $9 million, it never had any employees, and it never investigated the borrowers. Coal Funding's corporate income tax returns reveal that it was totally inactive during the relevant periods involved. In fact, its corporate charter was terminated on two separate occasions by the State of North Dakota for failure to file annual reports. The annual reports which were eventually filed state that its total assets were worth no more than $10,000. From these facts, it is clear that these alleged loan transactions had no economic substance and were entered into solely in an attempt to avoid the at-risk rules of section 465. We conclude that Coal Funding's role in the Price Coal program was a sham and, as such, is to be disregarded for Federal income tax purposes. *Knetsch v. United States*, 364 U.S. 361, 369 (1960); *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985), affg. on this issue 81 T.C. 184, 195–207 (1983); *Falsetti v. Commissioner*, 85 T.C. 332 (1985); *Julien v. Commissioner*, 82 T.C. 492 (1984); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1243 (1981). Thus, there were no amounts borrowed by the petitioners during the taxable years in issue within the meaning of section 465(b)(2).

In addition, we are convinced that the penalty provision in the mining contracts with Price Ltd. was in effect a guarantee, stop loss agreement, or other similar arrangement within the meaning of section 465(b)(4). The amounts owed by the investors to Coal Funding and the amounts owed by Price Ltd. to the investors bear a remarkable resemblance. For example, under the 1979–80 and 1980–81 programs, the investor-borrowers with one-half unit, after 5 years and five loans, would owe Coal Funding $130,968.75. At the same time, Price Ltd. would owe mining contract penalties of $130,975.20 to the investors. The same pattern holds true for the 1982 program. An investor who obtained a full unit would owe Coal Funding a total of $142,875 after

5 years. The same investor would be owed total penalties of $142,891.20.

This correlation exists year by year as well as program by program. An investor in the 1979–80 program could stop investing his own money after 3 years (as Mr. Spiller did) and still not be liable for any more money to Coal Funding than was owed to him by Price Ltd. It is beyond belief that the promoters and participants in the Price Coal program did not intend to achieve this result. It would be preposterous to believe that the fact that these calculations result in almost identical figures is a coincidence. Rather, the penalties were obviously designed to protect investors from ever being required to satisfy the "loans" from Coal Funding with their own money. The penalty amounts were not negotiated, as was contended at trial, but instead were standard for all investors. Finally, our conclusion is reinforced by the fact that if an investor chose to pay his advanced royalties by giving a nonrecourse note, he simply did not enter into a mining contract for that year. Thus, the penalty provisions applied only when an investor purported to enter into a personal obligation to pay the advanced royalties.

The petitioners were aware that the purpose of the penalties was to pay off their notes to Coal Funding, if such payment became necessary. Mr. Spiller testified on cross-examination about repayment of the loans to Coal Funding, as follows:

Q. And if there wasn't any coal—let's assume it was a bad investment, Mr. Spiller, if there wasn't any coal or it couldn't be mined economically—how were you going to pay that back?
A. Then the penalties here that we talked about would come into play.
Q. The penalties would come into play?
A. Yes.
Q. And they would pay it off—wouldn't they—if they couldn't mine, or they wouldn't mine or they didn't mine?
A. Yes, according to the total agreement.

On redirect, Mr. Spiller again indicated that he expected the penalty to pay the note if there was no mining:

Q. Okay, now we were talking—Mr. Bogner was talking about if Rodman G. Price, Ltd. failed to mine any coal then you would be entitled to these penalties, is that correct?

A. Correct.

\* \* \* \* \* \* \*

Q. The penalty that you would receive to pay the notes would be derived from which corporation?

A. Price Coal and Energy.

Q. I think it is Rodman G. Price, Ltd.

A. Rodman G. Price, Ltd.

Mrs. Croci was also questioned concerning the effect of the penalty provision. She and her husband had requested and received payments under the penalty provision for a year not at issue; such payment was transferred to Coal Funding to reduce the Crocis' note, and Coal Funding paid the money over to Mr. Price. Mrs. Croci also testified that she understood that the purpose of the penalty payment was to satisfy the note to Coal Funding.

The petitioners make the further argument that the penalty provision does not protect the taxpayers from all loss (for example, it does not cover their cash investments) and that therefore it does not constitute a guarantee, stop loss agreement, or other similar arrangement under section 465(b)(4). However, it is clear from the legislative history that such a loss-limiting arrangement may be partial in effect, as is illustrated by the following comment in the report of the Senate Finance Committee:

A limited partner who assumes personal liability on a loan to the partnership (made by a bank or other lender), but who obtains the general partner's *agreement to indemnify him against some or all of any loss* arising under such personal liability, *is at risk only with respect to the excess of the amount of the indebtedness over the maximum amount covered by the indemnity agreement.* [S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 87 n. 5; emphasis added.]

The petitioners also argue that because there were no agreements between them and the three corporations (Price Coal, Price Ltd., and Coal Funding) to the effect that the penalty payments would be used to offset the obligations under the notes, there was no stop loss agreement within the meaning of section 465(b)(4). However, it is the effect of an arrangement that determines whether an amount is at

risk under section 465(b)(4). The legislative history of the provision makes clear that third parties unrelated to the underlying investment may be parties to loss protection agreements:

a taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person.

\* \* \* \* \* \* \*

if a taxpayer is personally liable on a mortgage but he separately obtains insurance to compensate him for any payments which he must actually make under such personal liability, the taxpayer is at risk only to the extent of the uninsured portion of the personal liability to which he is exposed. \* \* \* [S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 87-88; fn. refs. omitted.]

It is obvious from the facts herein that the effect of the penalty provision was to protect an investor from any loss on the recourse note executed by him in favor of Coal Funding.[14]

Finally, the petitioners contend that the penalty provision is not a stop loss agreement because the investors (with the exception of Mrs. Croci and possibly one other investor not a petitioner herein) have not demanded payment. According to Mr. Price, they have not demanded payment, and will not, because such demands would cause Price Ltd. to become bankrupt. Such bankruptcy, it is alleged, would leave the petitioners liable to repay the loans to Coal Funding without any possibility of income from the mining and sale of coal. However, it is clear from the legislative history of section 465, however, that Congress intended that the potential insolvency of the party providing the loss protection is not a consideration in determining the applicability of section 465(b)(4) unless and until the insolvency actually occurs. The Finance Committee report states:

---

[14]Coal Funding's alleged independence from Mr. Price, Price Ltd., and Price Coal is irrelevant in that the Commissioner does not rely upon sec. 465(b)(3), which excludes from amounts at risk those funds borrowed from a person with an interest in the activity.

For purposes of this rule [i.e., section 465(b)(4)], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 88 n. 6.]

For these reasons, we have concluded that the penalty provisions in the mining contracts were stop loss agreements or other similar arrangements within the meaning of section 465(b)(4). Although we have also concluded that the purported loans by Coal Funding to the investors were a sham, a review of the entire arrangements among the investors, Price Coal, Coal Funding, and Price Ltd. leads us to believe that the penalty provisions were designed to offset any liabilities under the recourse notes to Coal Funding and that investors could not recover their cash investments through the penalty provisions. Hence, we are satisfied that the petitioners were at risk to the extent of their cash investments.

> *Decisions will be entered for the respondent in docket Nos. 27834-82 and 479-84.*
>
> *Decisions will be entered under Rule 155 in docket Nos. 25003-83 and 6754-84.*